UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

**FILED**
AUG 15 2016

| | |
|---|---|
| DIANE WADE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>SANFORD MEDICAL CENTER,<br>d/b/a SANFORD USD MEDICAL<br>CENTER, a South Dakota corporation,<br><br>Defendant. | CASE NO. 16-CV-3034<br><br>COMPLAINT AND DEMAND FOR<br>JURY TRIAL |

## INTRODUCTION

1. Plaintiff, Diane Wade, brings this action pursuant to the Age Discrimination in Employment Act, 29 USC §621, et seq., to remedy acts of employment discrimination and retaliation perpetrated against her by Sanford Medical Center d/b/a Sanford USD Medical Center ("Sanford" and/or "Defendant"). Plaintiff contends that Sanford officials created a hostile working environment for her, caused her to suffer major depression, punished her for using accumulated vacation time, discriminated against her due to her age, and finally, terminated her employment.

## JURISDICTION

2. Plaintiff Diane Wade ("Wade" and/or "Plaintiff") invokes the jurisdiction of this Court pursuant to 28 U.S.C. 451, 1331, 1337, 1343(a)(4) and 1345, and 42 U.S.C. 2000e-5(f).

1

3. This is an action arising under the laws of the United States and instituted pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621, et. seq.

4. This Court has jurisdiction over pendent state law claims alleged herein pursuant to 28 U.S.C. 1367.

5. On or about March 17, 2015, Wade timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (hereafter referred to as "EEOC").

6. On or about May 23, 2016, Plaintiff received a "Dismissal and Notice of Rights" ("Notice") from the EEOC allowing Plaintiff to commence an action within 90 days of her receipt of said notice. A copy of the Notice is attached hereto as Exhibit "A" and incorporated herein by reference.

**VENUE**

7. Venue is proper in this judicial district as Plaintiff was employed by Sanford in Sioux Falls, South Dakota at the time of her termination, it is believed that Plaintiff's employment records are maintained by Sanford in this judicial district, and decisions adverse to Plaintiff's employment that are the subject of this civil action were made in this judicial district.

**PARTIES**

8. Plaintiff, Diane Wade, a female who is over the age of forty (40) years old, is a citizen of the United States of America and a resident of the State of South Dakota. At all times relevant to this suit, until her termination in September 2014, Wade was employed with Sanford in Sioux Falls, South Dakota.

9. On information and belief, Defendant Sanford Medical Center d/b/a Sanford USD Medical Center is a South Dakota corporation which, at all relevant times herein, employed Plaintiff in Sioux Falls, South Dakota, and which has more than twenty (20) employees.

10. Defendant fits the definition of "employer" within the meaning of 42 U.S.C. 2000e(b) in that it is engaged in an industry affecting commerce and it has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and as defined by Title VII and Title I.

## STATEMENT OF FACTS

11. Wade was a career employee with over twenty-three years of service with Sanford before being terminated by Defendant on September 18, 2014.

12. At the time of her termination, Wade was employed by Sanford as the lead pediatric cardiac sonographer, and served as one of the highest paid employees in the pediatric cardiac unit.

13. In fact, Wade developed the program that is, or was, used by Sanford in the pediatric cardiac unit.

14. During her employment at Sanford, Wade received annual reviews regarding her work performance with Sanford.

15. Wade received high scores on all of her annual reviews, and was typically described as "going above and beyond" in relation to her job duties and performance at Sanford.

16. Sanford has never admonished Wade during her annual reviews for attendance, nor was her pay ever docked for any attendance related issues during the entire twenty-three years that Wade was employed by Sanford.

17. Wade routinely worked long hours and rarely missed work, other than Wade would take vacation time as she had accrued approximately four weeks of vacation time per year.

18. In fact, around the time of her termination, Wade had approximately 425 hours of sick time, which she had not used as she rarely called in sick. Wade also had accumulated PTO time, which she had not used.

19. At the time of her termination, Wade's first level supervisor was Sandy Josko ("Josko"), a female much younger than Wade, who made less money than Wade.

20. Josko made it known that she was displeased that Wade made more money than her by frequently complaining about the difference in their salaries, the difference in their ages, and made disparaging comments in relation to "supervising someone older than her".

21. Since being Wade's supervisor, Josko treated Wade differently from other younger employees, and created an extremely hostile work environment for Wade.

22. Josko also resented the respect that Wade received from the staff and doctors at Sanford, and created such a hostile work environment that it became difficult for Wade to be employed at Sanford.

23. Josko would favor the younger techs in the pediatric cardiac unit, whom were in their early to mid-thirties, and treated them more fairly than she treated Wade – who was fifty-four.

24. Despite being the lead pediatric cardiac sonographer, Josko would disregard Wade and give other employees leadership roles or responsibilities at Sanford – which was both hostile toward Wade, and which negated Wade's position in front of her colleagues and staff.

25. Andy Munce, a prior Vice President of Sanford, had Josko complete a Hogan Management Assessment as Josko had issues working with Wade "in her lead position." Unfortunately, things did not improve.

26. Josko frequently bypassed Wade on new developments or other issues in the pediatric world, and would go to some of the younger techs in the cardiac unit. In fact, Josko would not even inform Wade about new developments, despite the fact that Wade had seniority and was in a lead role at Sanford.

27. Josko would often schedule Wade to work in the Adult Echo Lab during the pediatrician tech meetings, and told Wade that she would not be allowed to attend the meetings unless Wade could find someone to cover her shift.

28. Josko would have other, younger, employees go to training and then have them train the rest of the pediatric staff – despite the fact that Wade was the "lead tech" and only formal preceptor in the pediatric cardiac unit.

29. Josko frequently refused, or failed, to advise Wade of changes or developments in the cardiac unit – deliberately causing issues for Wade.

30. Josko resented the support and relationship that the physicians in the unit had with Wade, as well as refuted Wade's ideas for developments and procedures in the cardiac unit – which the physicians in the unit fully supported.

31. Wade would put in for a vacation request many months in advance, and Josko frequently would change the call schedule so Wade would have to find people to switch with her, even though she had originally planned vacation time around her original call schedule.

32. In one instance, Wade was not scheduled to work during her daughter's wedding weekend, however in order to be sure and document her unavailability, Wade put in for vacation on that weekend. Josko then changed Wade's schedule so that Wade would not only be on call during the weekend of her daughter's wedding, but also scheduled Wade for an athletic screening on that Saturday. Josko told Wade that she would just have to find someone to switch with her if she wanted to attend her daughter's wedding – even though it was not originally Wade's weekend to work and Wade had put in for vacation time during that weekend many months in advance.

33. Despite the foregoing, Wade did not argue with Josko, she just started searching for someone to cover her shift.

34. Josko frequently behaved in such a manner, in an apparent effort to sabotage Wade because Josko disliked the fact that Wade was older and made more money than her, and therefore discriminated against her.

35. The hostile working environment continued throughout 2014. Josko isolated Wade from her colleagues by not including her in staff meetings, denying her leave and training, disapproving or not timely responding to her vacation requests and subjecting her to ridicule. Josko did not subject the younger employees who reported to her to such treatment.

36. Months in advance, Wade requested September 12, 2014 off from work due to a mandatory business trip that Wade needed to attend with her husband relating to a family business matter.

37. Wade never received a response from Josko to her time-off request.

38. Therefore, Wade advised Josko, once again, that she would not be available on September 12, 2014 due to a business trip.

39. Additionally, and which was the standard practice in the cardiac unit, Wade found another employee to cover for her on September 12, 2014.

40. In relation to Wade's unavailability on September 12th, Josko informed Wade "***not to worry about it***," and Josko was very nonchalant about the matter. Josko confirmed to Wade that she was aware that Wade was not available on September 12th, and Josko further stated that Wade rarely missed work and that Wade's annual percentage or missed time was very low. Thus, Wade believed the issue had been resolved, and there was no mention of any disciplinary action that would be taken against Wade if she missed work on September 12th.

41. However, when Wade returned to work after September 12, 2014, Wade's employment was terminated by Josko and/or Sanford, and Wade was escorted out of the building.

42. Thus, on or near September 18, 2014, Wade was wrongfully terminated from her employment, after 23 years.

43. The issue cited by Josko in terminating Wade was one (1) unauthorized missed day of work for the September 12, 2014 absence.

44. Another employee at Sanford, Ashley Hargreaves ("Ashley"), also a pediatric cardiac sonographer, had an unauthorized absence just prior to September 12, 2014.

45. However, Ashley received simple probation in response thereto.

46. Ashley was approximately 35 years old at the time, while Wade was 54 years old.

47. Ashley had a recent history of routinely missing work due to various personal matters, while Wade had no such current or recent history of missing work.

48. Ashley received numerous warnings regarding missing work, and upon an unauthorized absence in or near September 2014, Ashley only received probation – while Wade, an older employee, was terminated after twenty-three years of employment for one missed day of work.

49. Upon Wade's termination, various physicians from the cardiac unit have reached out to Wade and extended their sympathies, and their astonishment, about Wade's termination – which has been extremely distressful and embarrassing to Wade.

50. Wade's past patients have also inquired as to the whereabouts of Wade since her termination, which has also added to Wade's distress and embarrassment.

51. Not only did Wade work for Sanford for 23 years and develop the program used by Sanford in the pediatric cardiac unit, but Wade had developed a relationship with the doctors, patients and staff. After 23 years of faithful employment (and no other purportedly "unauthorized" absences), all of the foregoing was taken away from her with minimal explanation by Josko.

52. Wade not only lost her employment, she lost her career and has been unable to find similar gainful employment since her termination.

53. Wade has also suffered emotional distress, embarrassment, defamation, lost employment benefits, retirement, and other damages to be proven at trial.

54. In hindsight, it is clear that Josko was setting Wade up to be terminated, and her nonchalant attitude, and telling Wade "not to worry about it" in relation to her unavailability on September 14th was to mislead Wade into believing the absence was not significant.

55. Moreover, Josko's stated reason for terminating Wade was nothing more than a pretext to hide her discriminatory conduct toward Wade, and the real reason that Wade was terminated was due to Josko's discrimination against Wade due to her age.

56. At all relevant times herein, Josko was an agent of Sanford, and the wrongful actions of Josko and any other employee of Sanford were at all times related to their duties and responsibilities as agents of Defendant and/or accomplished by virtue of the authority granted to them by Defendant, and therefore Defendant is liable for the wrongful conduct of Josko and of Defendant's other agents and employees under the law of vicarious liability.

## COUNT ONE

**[Violation of the Age Discrimination in Employment Act (ADEA) 29 USC 621]**

57. The foregoing paragraphs are re-alleged and incorporated fully herein.

58. Plaintiff is a member of a protected class, as she is over the age of forty (40).

59. Plaintiff performed her work in a satisfactory manner and was qualified to do her job.

60. The effect of the practices complained of supra has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee and

the lead pediatric cardiac sonographer, because of her age.

61. The unlawful practices complained of supra were intentional.

62. The unlawful practices complained of supra were done with malice or reckless indifference to the federally protected rights of Plaintiff.

63. Defendant's conduct as alleged above constitutes discrimination based on Age discrimination in violation of ADEA.

64. The stated reasons for the Defendants' conduct in terminating Plaintiff were not the true reasons, but instead were pretext to hide the Defendant's discriminatory animus.

65. As a result of the foregoing, Plaintiff is entitled to damages, including but not limited to, actual, consequential and punitive damages.

## COUNT TWO

### [Hostile and Abusive Working Environment]

66. The foregoing paragraphs are re-alleged and fully incorporated herein.

67. Defendant's conduct as alleged above constitutes hostile and abusive working environment in violation of Title VII, Rehabilitation Act, and the ADEA.

68. The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's discriminatory animus.

## COUNT THREE

### [Intentional Inflection of Emotional Distress]

69. The foregoing paragraphs are re-alleged and fully incorporated herein.

70. The foregoing conduct by Defendant constitutes infliction of emotional distress.

71. Defendant's conduct was extreme and outrageous.

72. Plaintiff has suffered severe emotional distress as a result of Defendant's conduct.

73. As a result of the foregoing, Plaintiff is entitled to recover damages, including without limitations, actual, consequential and punitive damages.

## COUNT FOUR

### [Negligent Infliction of Emotional Distress]

74. The foregoing paragraphs are re-alleged and fully incorporated herein.

75. Defendant engaged in negligent conduct, including but not limited to, failing to abide by its duty to maintain a work environment free of discrimination and hostility, and failing to address the issue or abide by its own policies.

76. Plaintiff suffered emotional distress.

77. Defendant's conduct was a legal and proximate cause of the Plaintiff's emotional distress.

78. Plaintiff suffered physical manifestations of emotional distress, including but not limited to, loss of sleep, headaches, anxiety, depression, and Plaintiff continues to suffer said manifestations.

79. As a result of the foregoing, Plaintiff is entitled to recover damages including, but not limited to, actual, consequential and punitive damages.

## COUNT FIVE

### [Punitive Damages]

80. The foregoing paragraphs are re-alleged and fully incorporated herein.

81. Based on the foregoing, Defendant's conduct showed a disregard for Plaintiff's rights because it acted willfully or wantonly to the injury of Plaintiff, and Defendant is therefore liable to Plaintiff for punitive damages.

## DEMAND FOR JURY TRIAL

82. The foregoing paragraphs are re-alleged and fully incorporated herein.

83. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby requests trial by jury of the issues of fact in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

(a) For compensatory damages arising from past, present and future loss of income, including loss of benefits, loss of career development, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of enjoyment of life and loss of job satisfaction in an amount to be determined at trial;

(b) For punitive damages arising from Defendant's conduct toward Plaintiff in an amount to be determined at trial;

(c) For an order of the Court awarding Plaintiff her back pay, front pay, attorney fees, costs and disbursements incurred herein as allowed by law;

(d) For such other and further relief as the Court deems just and equitable.

Dated this 12th day of August, 2016.

KNECHT ROBINSON LAW, P.C.

_____
Cathy K. Robinson, Esq.
cathy@knechtlawoffices.com
100 Douglas Avenue, Suite 102
Yankton, SD 57078
(888) 501-5631
Attorneys for DIANE WADE