UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| DIANE WADE, AN INDIVIDUAL;<br><br>Plaintiff,<br><br>vs.<br><br>SANFORD MEDICAL CENTER, A SOUTH DAKOTA CORPORATION;<br><br>Defendant. | 3:16-CV-03034-RAL<br><br><br>OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

Plaintiff Diane Wade (Wade) filed a Complaint against Defendant Sanford Medical Center (SMC) alleging violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq*., (Count I), hostile work environment in violation of Title VII (Count II), intentional infliction of emotional distress (Count III), negligent infliction of emotional distress (Count IV), and punitive damages (Count V). Doc. 1. SMC moved for summary judgment, Doc. 14, which Wade opposed, Doc. 24. For the reasons explained below, this Court grants SMC's motion for summary judgment.

## I.    Undisputed Facts[1]

---

[1] This Court takes the facts in the light most favorable to Wade as the non-moving party and draws the facts primarily from the portion of SMC's Statement of Undisputed Material Facts, Doc. 15, that was not genuinely contested in Wade's Response to Statement of Genuine Disputes of Material Facts, Doc. 26. Wade filed evidentiary objections to a number of exhibits submitted by SMC, arguing each exhibit was inadmissible pursuant to Rules 602 (lack of foundation), 801 and 802 (hearsay), and 901 (lack of authentication) of the Federal Rules of Evidence. Doc. 27. Wade did not provide further explanation as to the basis of these objections beyond citation of the aforementioned rules. The exhibits in question include documents produced by SMC to Wade

## A. Wade's History and Conduct Leading to Termination

Wade began her career with SMC on August 8, 1991, when SMC was known as Sioux Valley Hospital. Doc. 15 at ¶ 1; Doc. 26 at ¶ 1. SMC terminated Wade's employment on September 18, 2014, when Wade was 54 years old. Doc. 15 at ¶¶ 2, 6; Doc. 26 at ¶¶ 2, 6. At the time of her termination, Wade was the lead pediatric cardiac ultrasound sonographer in the pediatric unit, but was dually certified to work in both the pediatric and adult cardiac sonography units. Doc. 15 at ¶¶ 3, 5; Doc. 26 at ¶¶ 3, 5. Wade also was a formal preceptor in the pediatric unit whereby she received additional compensation when she was training new employees, a position which required Wade to undergo additional training. Doc. 15 at ¶ 4; Doc. 26 at ¶ 4.

SMC has an Attendance and Punctuality policy which outlines the expectations for employees of SMC with respect to their attendance and punctuality. The policy states that "[e]mployees have the personal responsibility to ensure that they are at their work station and are ready to work at the starting time of their assigned shift. Reliable and consistent attendance is required for job performance success." Doc. 15 at ¶ 9; Doc. 16-10 at 1. The Attendance and Punctuality policy further establishes that when "an employee does not meet the attendance expectations outlined, they will be subject to the progressive discipline process" and directs employees to reference the Discipline policy. Doc. 16-10 at 3. SMC's progressive discipline procedure begins with an informal process consisting of communication with the employee by the manager, requiring no documentation or involvement of the Human Resources Department. Doc. 16-11 at 2. If attendance and punctuality problems persist, the process progresses from verbal

---

which largely are business records of SMC, such as the Attendance and Punctuality Policy and discipline records, kept in the normal course of business. Because such exhibits are admissible business records, this Court overrules Wade's objections and considers as undisputed facts matters in SMC's Statement of Undisputed Material Facts which Wade did not admit solely because of evidentiary objections to SMC's business records.

2

reminders to written warnings, and then to Decision Making Leave (DML) prior to involuntary termination.[2]  Doc. 16-11 at 3.

During her annual evaluation in May of 2008, Wade's supervisor—at that time Tom Denevan—spoke with Wade about her tardiness and the expectation that SMC employees be clocked in and prepared to work at the start of their scheduled shift.[3]  Doc. 15 at ¶ 12.  Meanwhile, Wade's 2008 annual evaluation recorded that she "Meets Expectations" or "Exceeds Expectations" in every category for which she was evaluated, and did not mention any attendance issues.  Doc. 26 at ¶ 12; Doc. 28-2.

Wade received a written warning on December 9, 2008, which raised punctuality and productivity concerns.  Doc. 15 at ¶ 13; Doc. 26 at ¶ 13; Doc. 16-8 at 28–29.  The warning stated that Wade had a tardiness percentage of 80 percent for the 46 in-house shifts for which she was scheduled from September 20 to December 9, 2008.  Doc. 15 at ¶ 14; Doc. 26 at ¶ 14.  The documents warned Wade that failure to comply with SMC's Attendance and Punctuality policy would result in further disciplinary action.  Doc. 15 at ¶ 15; Doc. 26 at ¶ 15.  However, in Wade's 2009 annual evaluation her supervisor noted that "Diane['s] attendance is much improved meeting supervisor[']s expectations since our 12/09/08 discussion."  Doc. 26 at ¶ 14; Doc. 28-3; Doc. 30-5 at 6.  In that evaluation, Wade received a rating of "Exceeds Expectations" or "Outstanding Performance" in every category for which she was rated.  Doc. 30-5 at 1–5.

_____

[2] The Discipline policy also contains alternative steps in the formal process which include final written reminders (which may be issued for a policy violation in lieu of a DML, based upon the offense) and suspensions when there is a need to investigate an incident involving the employee. Doc. 16-11 at 3.

[3] Wade disputes this fact on the basis that her 2008 annual evaluation makes no mention of tardiness.  Doc. 26 at ¶ 12.  However, this verbal conversation is documented in the written warnings and DML Wade received, as well as her separation paperwork.  See Doc. 16-8 at 22–23, 25–29; Doc. 16-13 at 2–3.  Each of these documents was signed by Wade.

Wade received a second written warning concerning punctuality and productivity on October 28, 2009.[4] Doc. 15 at ¶ 16; Doc. 16-8 at 25–27. The warning stated that Wade clocked in late for 9 of 15 in-house shifts for which she was scheduled from September 2 to October 12, 2009, for a tardiness percentage of 60 percent. Doc. 15 at ¶ 17; Doc. 16-8 at 25. The written warning informed Wade that "future concerns will result in further disciplinary action up to and including termination." Doc. 16-8 at 26. Wade signed the written warning on November 16, 2009, and under "Employee Response" she handwrote an action plan to address her tardiness, among other issues. Doc. 16-8 at 27. Wade's 2010 annual evaluation documented that she received the written warning in October of 2009, but it made no further mention of attendance or punctuality issues and Wade received ratings of "Meets Expectations" or above in every category for which she was evaluated. Doc. 28-4 at 1–11.

Sandra Josko (Josko) became the Cardiovascular Services (CVS) diagnostic manager in the summer of 2011. Doc. 15 at ¶ 20; Doc. 26 at ¶ 20. As CVS manager, Josko supervised the adult and pediatric cardiac sonography units, making her Wade's direct supervisor as of the summer of 2011 until Wade's termination in 2014. Doc. 15 at ¶¶ 7, 20, 22; Doc. 26 at ¶¶ 7, 20, 22. Josko managed the staff and created the schedules for both the adult and pediatric cardiac sonography units. Doc. 15 at ¶ 22; Doc. 26 at ¶ 22.

Josko spoke with Wade regarding her tardiness percentage for the pay period from November 27 through December 10, 2011. Doc. 15 at ¶ 23; Doc. 26 at ¶ 23. Josko's later email to Wade stated that Wade was late for every shift during that pay period, and for shifts during the

---

[4] Wade disputes this fact on the basis that it was not documented in her 2009 or 2010 annual evaluation, and objects that it is irrelevant to her termination in 2014. Doc. 26 at ¶ 16. However, SMC submitted the written warning which bears Wade's signature, and her 2010 evaluation does indeed note that she had a "written counseling session" on October 28, 2009, regarding attendance and productivity. Doc. 16-8 at 25–27; Doc. 28-4 at 11.

4

prior pay period as well. Doc. 16-8 at 40. However, the tardiness percentage for this time period was recorded at 75 percent in later documentation. See Doc. 16-13 at 2. Wade's 2011 annual evaluation, dated May 16, 2011, did not refer to any attendance issues, noted that Wade is an extremely skilled sonographer, and gave Wade a "Meets Expectations" or "Exceeds Expectations" under every evaluative category. Doc. 28-5 at 8. In her 2012 annual evaluation, dated August 28, 2012, Wade again met or exceeded expectations in all evaluative categories, though her manager documented that "[i]t was requested that [Wade] work on her punctuality and to be here when her shift started, [and Wade] has made an effort to be more dependable." Doc. 28-6 at 8. That evaluation also noted Wade "is committed to Sanford Health and the standards of care [SMC] provide patients." Doc. 28-6 at 8.

Wade had another conversation with Josko and other supervisors in November of 2012 regarding her tardiness percentages during several previous pay periods. Doc. 15 at ¶ 24; Doc. 26 at ¶ 24. According to SMC business records, Wade had a tardiness percentage of 50 percent from November 19 through November 30; 0 percent for the 2 shifts worked between November 5 and November 16; 80 percent from October 22 through November 1; 50 percent from October 8 through October 19; 40 percent from September 24 through October 5; and 0 percent for the two shifts worked between September 17 and September 21.[5] Doc. 15 at ¶¶ 25–28; Doc. 16-8 at 22; Doc. 16-13 at 2.

On December 5, 2012, Wade was placed on a DML. Doc. 16-8 at 22–23. The DML paperwork stated that "[Wade] has not followed Sanford's guidelines for Punctuality. [Wade] has

---

[5] Wade disputes the tardiness percentages based on a lack of recollection of those percentages. Doc. 26 at ¶¶ 25–28. However, these percentages are documented in Wade's DML, Doc. 16-8 at 22–23, and her termination paperwork, Doc. 16-13. Wade signed both documents without noting any dispute with those percentages.

had many verbal conversations as well as Written Warnings regarding her tardiness. Her tardiness continues to fall outside of Sanford's expectations." Doc. 16-8 at 22. The DML further directed that Wade was to present an action plan when she returned on December 6, 2012, detailing how she would commit to meeting performance expectations or resign her position. Doc. 16-8 at 22. The final paragraph of the DML stated that "[t]his is the final step in the discipline process. If you commit to staying in your position, you need to commit to fully acceptable attendance and punctuality. Failure to meet the Sanford expectation of performance will result in termination of your employment." Doc. 16-8 at 23. The DML documentation was signed by Wade, Josko, and a representative from Human Resources. Doc. 16-8 at 23. Wade also hand wrote an action plan, dated December 5, 2012, indicating she would leave for work 15 minutes earlier and would contact Josko in the event she was delayed on her way to work. Doc. 16-8 at 24.

Wade left her shift on December 31, 2012, to attend a personal appointment and rescheduled a patient appointment to do so. Doc. 15 at ¶¶ 37–38; Doc. 26 at ¶¶ 37–38. Josko emailed Wade to explain that, because Wade left her shift without prior management approval, her absence would be documented as an unapproved absence, and attached portions of the Attendance and Punctuality policy which establish that employees "must receive prior authorization from their supervisor before leaving Sanford premises during their scheduled work hours." Doc. 16-8 at 50; see also Doc. 16-10 at 2. Wade's 2013 annual evaluation, dated June 4, 2013, documented that she was placed on a DML in December of 2012 for excessive tardiness, though it did not mention the December 31, 2012 appointment incident. Doc. 28-7. While the evaluation noted that Wade "often needs to be remined that she holds a position at Sanford as a dual registered sonographer, which comes with more responsibility than a single registered sonographer[,]" Wade received scores of "Meets Expectations," "Exceeds Expectations," or "Outstanding Performance" in each

evaluative category. Doc. 28-7 at 2–7. Wade's 2014 annual evaluation also noted that she meets or exceeds expectations in every evaluative category but documented that Wade "continues to struggle with time management." Doc. 28-8 at 8.

On July 30, 2014, Wade submitted a Paid Time Off (PTO) request for September 10 through September 15, 2014. Doc. 15 at ¶ 43; Doc. 26 at ¶ 43. Pediatric cardiac sonographers at SMC are able to submit PTO requests up to six months in advance. Doc. 15 at ¶ 42; Doc. 26 at ¶ 42. Wade requested the PTO to go on a trip with her husband, and her husband had purchased the airline tickets for the trip prior to Josko's August 19, 2014 response to Wade's PTO request. Doc. 15 at ¶¶ 44–45; Doc. 26 at ¶¶ 44–45. On that day, Josko emailed Wade to inform her that she could not grant Wade's request for PTO on September 12, stating that another pediatric sonographer, Sarah Bohnenberger (Bohnenberger), had requested PTO for that same date prior to Wade's request. Doc. 15 at ¶ 46; Doc. 26 at ¶ 46. There were two pediatric cardiologists scheduled to see patients at Sanford Children's Hospital on September 12, 2014, and SMC's policy was to have two pediatric cardiac sonographers available to scan patients on such days. Doc. 15 at ¶¶ 47–48; Doc. 26 at ¶¶ 47–48. SMC required a total of four pediatric cardiac sonographers on September 12, 2014, because in addition to the two required at the Children's Hospital, SMC policy required one sonographer to be on call to cover the hospital and neonatal intensive care unit and an additional sonographer was needed to cover an athletic screening scheduled on that same date. Doc. 15 at ¶¶ 49–50; Doc. 26 at ¶¶ 49–50. At the time Josko denied Wade's request for PTO, SMC employed a total of five pediatric cardiac sonographers. Doc. 15 at ¶ 50; Doc. 26 at ¶ 50.

Wade responded to Josko's email on August 20, 2014, stating "I will start working on it[,] I already have plane tickets." Doc. 15 at ¶ 51; Doc. 26 at ¶ 51. Josko responded that "[t]here are no options for staff. I have a screening scheduled and there is double clinic in the am." Doc. 15

at ¶ 52; Doc. 26 at ¶ 52. Wade contacted Bohnenberger and requested that she cover Wade's shift on September 12, and Bohnenberger indicated she would be willing to do so if she would be allowed to leave during her shift to attend an appointment scheduled for the morning of September 12. Doc. 15 at ¶¶ 53–54; Doc. 26 at ¶ 53–54. After Josko informed Bohnenberger that it was not guaranteed that she would be permitted to leave during her shift, Bohnenberger informed Wade that she could not cover the September 12 shift. Doc. 16-8 at 44.

On August 21, 2014, Wade emailed the other pediatric cardiac sonographers regarding the schedule for September 12. Doc. 16-8 at 49. Wade indicated that she would ask the physicians if Rochelle Boone (Boone), who was still training as a pediatric cardiac sonographer, could do the athletic screening on her own and whether the remaining two sonographers, Ashley Hargreaves (Hargreaves) and Jackie Salzwedel (Salzwedel) would be alright if the two of them were left to cover the double clinic and "inhouse" if the physicians approved. Doc. 15 at ¶ 74; Doc. 16-8 at 49. Pediatric cardiac sonographers often emailed their peers with requests to change the schedule to cover call. Doc. 15 at ¶ 57; Doc. 26 at ¶ 57.

Bridget O'Brien Johnson, at the time Bridget Rients, (Johnson), was Josko's direct supervisor in August of 2014. Doc. 15 at ¶ 8; Doc. 26 at ¶ 8. When Johnson learned of Wade's email, Johnson emailed Human Resources to express concerns that Wade had not included Josko or Johnson on the email to inform them of any such plan; that Boone was still in orientation and the physicians had stated that she could not go on screenings; and that having only two sonographers to cover the Children's Hospital as well as the hospital and neonatal intensive care unit would limit staffing and cause delays, compromising patient care. Doc. 16-8 at 48.

Wade emailed Johnson on September 5, 2014, to inform her that she would not be at work during her shift scheduled for September 12. Doc. 16-8 at 44. Johnson responded on September

8, requesting that Wade and Johnson "touch base" with Josko sometime that day. Doc. 16-8 at 44.

Wade emailed Johnson back that afternoon, stating she had been busy in clinic that day and had not yet been able to reach Josko, but would attempt to call her again that day. Doc. 16-8 at 43.

Johnson emailed Josko on September 9 regarding the plan for the September 12 shift and inquired whether Wade and Josko had communicated the previous day. Doc. 16-8 at 43. Josko responded to Johnson's email, stating:

> I talked to [Wade] late yesterday afternoon. I told her that you and I had discussed the issue and that if she is not here on Friday that it would be considered an unexcused PTOU[6] day. She asked if she needed [to] call in and tell us on Friday morning that she would not be in and I said no[, y]ou already notified me and Bridget said you sent her an email. I reminded her that she was not approved for the vacation and that she would be considered a no show for her shift. I also reminded her the plane tickets cannot be purchased prior to receiving vacation approval, I do not recall that she had a response to this.

Doc. 16-8 at 43. Wade did not work her scheduled shift on September 12, 2014. Doc. 15 at ¶ 70; Doc. 16-13.

Josko sent an email to the pediatric cardiac sonographers on September 3, 2014, which stated that "[d]uring this time—all staff on back up call with [Boone] will need to come in to the hospital when she does. You will need to follow call expectations of 30 minutes bedside after receiving a page." Doc. 16-8 at 51. On September 16, 2014, Wade was on back up call with Boone, who was in training and not off orientation. Doc. 15 at ¶ 74; Doc. 26 at ¶ 74. When Boone contacted Wade on September 16 informing Wade that they had been called to the emergency room, Wade asked Boone if Boone wanted her to come in. Doc. 15 at ¶ 75; Doc. 26 at ¶ 75. Boone did not ask Wade to come in, thus Wade did not accompany Boone to the hospital. Doc. 15 at

---

[6] PTOU stands for unplanned time off, which is any absence that was not approved in advance. See Doc. 16-10 at 2.

¶ 77; Doc. 26 at ¶ 77. When Josko questioned Wade on September 17, 2014, as to why she did not accompany Boone, Wade stated that she had not gotten caught up on her emails since being on vacation and was unaware of Josko's directive to accompany Boone. Doc. 15 at ¶ 78; Doc. 26 at ¶ 78.

Josko prepared and submitted to Human Resources documentation regarding Wade's missed shift on September 12 and decision not to accompany Boone on September 16. Doc. 15 at ¶ 87; Doc. 26 at ¶ 87. Wade's situation was discussed by Johnson; Patsy Kramer (Kramer), a Human Resources Advisor at SMC; Karla Haugan (Haugan), the vice president of Human Resources at SMC; Kathryn Schuler (Schuler), a vice president at SMC; and Robin Burnley (Burnley), the Director of Human Resources at SMC. Doc. 16-8 at 53–57. Kramer forwarded the documentation prepared by Josko to the group via email on September 17, 2014, asking whether each individual supported termination or a second DML for Wade. Doc. 16-8 at 53. Kramer's email mentions that "[w]e have had a couple other situations within Sanford in which we gave the employees an additional DML if time had passed since the previous. In the two situations that I reviewed there was about 2 years between the two DMLs for the employees."[7] Doc. 16-8 at 53. Schuler responded that:

> Based on past history and DML I support termination. [Wade] is in a leadership role, and is supposed to set the example for the team. I do not agree with setting a precedence [sic] of a second DML process at SMC. To my knowledge we have not done that before. It seems she has adequate time to reflect personally and change habits.

Doc. 16-8 at 53. Haugan declined to support either option, stating:

> I could go either way on this individual—very rarely do we have an employee whose primary issue for an on-going period is tardiness.

---

[7] Wade's previous DML was dated December 5, 2012, Doc. 16-8 at 22–23, about 21 months previously.

> I know that these are not easy positions to recruit for and she has been here a long time. How [are] her skills as a cardiac sonographer? I will defer this one to Andy, [Johnson] and [Josko].

Doc. 16-8 at 55. Johnson supported termination, stating:

> [Wade's] skills as a sonographer are solid. However, he[r] decision making is of concern to me and this is affecting the team and patient care. This was also evident in the decision she made last night after we visited with her yesterday regarding her unplanned PTO.

Doc. 16-8 at 56. Finally, Burnley also supported termination, stating:

> I support termination. We are starting to see where DML's have been presented a few years ago and need to make the decision if we do another step or go to termination. I think we need to take into consideration if the current issue is a continued pattern of behavior or if it is something new. Given that the DML was related to attendance issues as well as this most recent issue, I support termination.

Doc. 16-8 at 56.

Kramer notified Josko that the decision had been made to terminate Wade. Doc. 15 at ¶ 89; Doc. 26 at ¶ 89. On September 18, 2014, Wade was informed that she was being terminated. Doc. 15 at ¶ 84; Doc. 26 at ¶ 84. Kramer, Josko, and Johnson were present at the time Wade was informed of her termination, and Kramer and Johnson both signed Wade's termination paperwork. Doc. 15 at ¶ 84; Doc. 26 at ¶ 84. Wade also signed the termination paperwork and provided a handwritten response; Wade's response did not assert that her termination was connected to age discrimination, though she did write that "rules seem to be different for everyone in [Josko's] department." Doc. 16-13 at 3. After Wade was terminated, she was asked to "go to her car." Doc. 15 at ¶ 84; Doc. 26 at ¶ 84. During his deposition, Wade's husband, Doug Wade (Doug), testified that after her termination Wade did not leave the house for a week, was disorganized, and cried more often than usual. Doc. 15 at ¶ 209; Doc. 26 at ¶ 209.

A week after her termination, Wade attended an annual examination with her primary care physician, Dr. Sherri Bostwick (Bostwick). Doc. 15 at ¶¶ 182–83; Doc. 26 at ¶¶ 182–83. During that examination, Wade reported that she "has generally been very healthy." Doc. 15 at ¶ 184; Doc. 26 at ¶ 184. Wade also informed Bostwick of a number of things regarding her health: that she had no chronic medical conditions and took only over-the-counter medications and vitamins; that she had no unexpected changes in weight or fatigue, no abdominal pain or changes in bowel habits, no significant change in appetite, and no nausea, vomiting, diarrhea or constipation; and finally that she did not have chronic headaches nor did she have depression or anxiety. Doc. 15 at ¶¶ 185–87; Doc. 26 at ¶¶ 185–87. Bostwick documented that Wade's blood pressure was normal and that Wade appeared "alert, well appearing, and in no distress." Doc. 15 at ¶¶ 188–89; Doc. 26 at ¶¶ 188–89. Wade also reported that she was not having pain anywhere. Doc. 15 at ¶ 191; Doc. 26 at ¶ 191. At the beginning of the September 25, 2014 examination, one of Bostwick's nurses completed with Wade a Behavioral Health Screening-6 (BHS-6). Doc. 15 at ¶ 192; Doc. 26 at ¶ 192. During the BHS-6, Wade was asked whether over the previous two weeks she had: felt little interest or pleasure in doing things; felt down, depressed, or hopeless; felt nervous anxious, or on edge; or not been able to stop or control worrying. Doc.15 at ¶¶ 193–96; Doc. 26 at ¶¶ 193–96. According to the BHS-6 report, Wade responded "not at all" to each of these questions. Doc.15 at ¶¶ 193–96; Doc. 26 at ¶¶ 193–96.

During Wade's annual examination with Bostwick in November of 2015, Wade reported the same lack of any health problems and responded to the BHS-6 in the same manner as during her September 25, 2014 examination. Doc. 15 at ¶¶ 197–208. Since her termination, Wade has not sought professional treatment or assistance for anxiety, depression, difficulty sleeping, or headaches, nor has she been prescribed medications for any such condition. Doc. 15 at ¶¶ 180–

81; Doc. 26 at 180–81. During her deposition, Wade testified that she was not seeking treatment for these conditions because "I didn't want to be tagged with anything. I'm—like I said, I'm a private person. It was a new doctor. These are not things I wanted to talk about." Doc. 16-1 at 14.

Wade filed a complaint with the Equal Employment Opportunity Commission (EEOC) in March of 2015, alleging that she was unlawfully terminated due to her age. Doc. 15 at ¶ 93; Doc. 26 at ¶ 93. Wade claims that Josko was the only person to discriminate against her, and has not claimed that any other Sanford employee harassed or discriminated against her. Doc. 15 at ¶¶ 136–37; Doc. 26 at ¶¶ 136–37. The EEOC mailed a dismissal and notice of suit rights to Wade and SMC on May 18, 2016, stating that it was "unable to conclude that the information obtained establishes violations of the statutes." Doc. 15 at ¶ 178; Doc. 26 at ¶ 178.

SMC adheres to a written Anti-Discrimination and Harassment policy, and Wade was aware of this policy. Doc. 15 at ¶¶ 120–21; Doc. 16-12; Doc. 26 at ¶ 121. Wade completed online training titled "Understanding Workplace Diversity, Harassment and Discrimination" on an annual basis which reviewed this policy on harassment and discrimination, including how to report discrimination or harassment. Doc. 15 at ¶¶ 125–27; Doc. 26 at ¶¶ 125–27. Wade did not complain or report to any person at SMC that she felt Josko was discriminating against her on the basis of her age. Doc. 15 at ¶ 124; Doc. 26 at ¶ 124.

### B. Other Events and Information Relevant to this Motion

SMC has a policy of having one pediatric cardiac sonographer on call every evening, weekend, and holiday. Doc. 15 at ¶ 170; Doc. 26 at ¶ 170. As a pediatric cardiac sonographer, Wade's duties included covering call. Doc. 15 at ¶ 170; Doc. 26 at ¶ 170. The call schedule was typically set at the beginning of the year, and after Josko had set the call schedule for calendar year

13

2014, Wade's daughter and her fiancé (now husband) scheduled their wedding on a weekend in August of 2014 when Wade was not scheduled to be on call. Doc. 15 at ¶¶ 171–72; Doc. 26 at ¶¶ 171–72. Subsequent to Wade's daughter scheduling her wedding for the weekend in August of 2014, two pediatric cardiac sonographers left the department, requiring the call schedule to be revised to provide for complete call coverage for the calendar year. Doc. 15 at ¶ 173; Doc. 26 at ¶ 173. When Josko revised the schedule, she scheduled Wade to cover an athletic screening on the day of her daughter's wedding, though Wade was able to work with her colleagues to switch coverage and attended the wedding. Doc. 15 at ¶ 174; Doc. 26 at ¶ 174.

Ashley Hargreaves was a pediatric cardiac sonographer working in the pediatric cardiac sonography unit at SMC in the summer of 2014. Doc. 15 at ¶ 100; Doc. 26 at ¶ 100. Hargreaves had been employed at Sanford as a pediatric cardiac sonographer since March 10, 2003, and was under 40 years old in the summer of 2014. Doc. 15 at ¶¶ 99, 115; Doc. 26 at ¶ 112. On May 2, 2014, Hargreaves emailed Josko requesting PTO for a period which included June 23 through June 27, 2014. Doc. 16-9 at 10. Josko responded to Hargreaves, informing Hargreaves that another employee already had vacation that week, and asked if Hargreaves could work on June 26 and 27, 2014. Doc. 16-9 at 10. Hargreaves emailed Josko again on May 27, 2014, asking whether Josko could grant her PTO request for June 26 and 27, indicating that two physicians would be on vacation at that time. Doc. 16-9 at 11–12. Josko responded the following day and informed Hargreaves that her PTO request could not be accommodated. Doc. 16-9 at 11. Hargreaves emailed Josko back later that day indicating that Hargreaves's husband had already purchased plane tickets. Doc. 16-9 at 11. Josko emailed Hargreaves back, explaining that one sonographer's vacation was already approved and two others were committed to a screening. Doc. 16-9 at 11. Hargreaves inquired as to whether the screenings could be rescheduled but Josko indicated that

14

"[w]e are committed to the screening on this date." Doc. 16-9 at 11, 42. Hargreaves emailed Josko again on June 10, 2014, in an attempt to propose ideas that would allow her PTO request to be accommodated, but was unsuccessful. Doc. 16-9 at 41–42.

According to Josko, Hargreaves called Josko on June 25, 2014, to call in ill for her shift on June 26. Doc. 16-9 at 16, 40. Josko reported that Hargreaves was still in Tennessee and had not purchased a plane ticket home and that Hargreaves reported her son and husband were both throwing up, necessitating her presence. Doc. 16-9 at 40. Hargreaves was issued a written warning on July 11, 2014, for missing her June 26, 2014, shift. Doc. 16-9 at 14–16. Hargreaves's July 11 written warning documents three prior verbal warnings regarding Hargreaves's attendance and punctuality, specifically on December 17, 2013, January 2, 2014, and March 26, 2014. Doc. 16-9 at 14. Hargreaves was required to complete skill builders and submit certificates of completion to Josko as well. Doc. 16-9 at 16. Hargreaves provided a written response which severely criticized Josko's management and record keeping. Doc. 16-9 at 17–19. Hargreaves contended that Josko treated employees differently based on whether Josko liked or disliked that employee. Doc. 16-9 at 19. When Hargreaves voluntarily resigned her position with Sanford on January 6, 2016, she completed an exit survey and again criticized Josko's management. Doc. 15 at ¶¶ 117–18; Doc. 16-19 at 9.

Before Wade's termination on September 18, 2014, some of the pediatric cardiologists complained to Human Resources about Josko's management of the pediatric cardiac sonography unit. Doc. 15 at ¶ 131; Doc. 26 at ¶ 131. At least one pediatric cardiologist complained directly to Josko regarding her management of the department. Doc. 15 at ¶ 132; Doc. 26 at ¶ 132. In addition, the pediatric cardiologists have complained to their clinic director regarding Josko's management of the department. Doc. 15 at ¶ 133; Doc. 26 at ¶ 133. After Wade was terminated,

at least one pediatric cardiologist expressed concern that losing a skilled pediatric cardiac sonographer such as Wade would hinder Sanford's ability to provide adequate coverage for pediatric cardiac patients. Doc. 15 at ¶ 134; Doc. 26 at ¶ 134. One pediatric cardiologist, after Wade was terminated, expressed disagreement with the decision to terminate Wade as she was a skilled pediatric cardiac sonographer, indicated that Josko was a "bad manager," and expressed an uncertainty as to why Sanford would terminate a skilled technician for a policy violation. Doc. 15 at ¶ 135; Doc. 26 at ¶ 135.

## II.   Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Mortg. & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). There is a genuine issue of material fact if a "reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007); see also Reasonover v. St. Louis Cty., 447 F.3d 569, 578 (8th Cir. 2006) ("Evidence, not contentions, avoids summary judgment.") (quoting Mayer v. Nextel W. Corp., 318 F.3d 803, 809 (8th Cir. 2003)). Summary

judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Cases alleging discrimination are subject to the same summary judgment standard as any other case. Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc).

## III.    Discussion

### A. ADEA Claim

The ADEA forbids discrimination against employees, age forty and over, because of their age. 29 U.S.C. §§ 623(a)(1), 631(a). To prove her claim under the ADEA, Wade must show by a preponderance of the evidence that age was the "but-for" cause of the adverse employment action. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009) ("[T]he plaintiff [in an ADEA case] retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action."); Buehrle v. City of O'Fallon, 695 F.3d 807, 813 (8th Cir. 2012) ("Under the ADEA standard, a plaintiff must 'establish that age was the "but-for" cause of the employer's adverse action.'" (quoting Gross, 557 U.S. at 177)). Wade may have her ADEA claim survive summary judgment "either by providing direct evidence of discrimination or by creating an inference of unlawful discrimination through the McDonnell Douglas [Corp. v. Green, 411 U.S. 792 (1973)] analysis." [8] Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 953 (8th Cir. 2012). Wade contends that she has direct evidence of discrimination and, alternatively, that she can satisfy the McDonnell Douglas test.

---

[8] The Supreme Court explained in Gross that it has not definitively decided whether the McDonnell Douglas framework applies in ADEA cases. Gross, 557 U.S. at 175 n.2. Nevertheless, the Eighth Circuit has continued to apply the framework in ADEA cases. See Tusing v. Des Moines Indep. Cmty. Sch. Dist., 639 F.3d 507, 515 (8th Cir. 2011) (upholding the continued applicability of the McDonnell Douglas framework after Gross).

## 1. Direct Evidence

The Eighth Circuit has explained that direct evidence in this context "is not the converse of circumstantial evidence . . . [but] is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." Bone, 686 F.3d at 953 (alteration in original) (internal quotation marks omitted) (quoting Torgerson, 643 F.3d at 1044). This evidence "must be 'strong' and must 'clearly point[] to the presence of an illegal motive' for the adverse action." Id. (alteration in original) (quoting Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004)). Direct evidence "may include evidence of actions or remarks of the employer that reflect a discriminatory attitude, comments which demonstrate a discriminatory animus in the decisional process, or comments uttered by individuals closely involved in employment decisions." King v. United States, 553 F.3d 1156, 1161 (8th Cir. 2009) (internal quotation marks omitted) (quoting King v. Hardesty, 517 F.3d 1049, 1058 (8th Cir. 2008)). However, "stray remarks in the workplace, statements by nondecisionmakers, and statements by decisionmakers unrelated to the decisional process do not constitute direct evidence." Id. at 1160–61 (internal quotation marks omitted) (quoting Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P., 444 F.3d 961, 966 (8th Cir. 2006)).

Wade argues that she has presented direct evidence of discrimination on the part of Josko with evidence of: 1) Wade's history of positive annual performance evaluations; 2) Josko's treating younger sonographers more favorably than Wade; 3) Josko "setting Wade up" prior to the missed shift on September 12, 2014, by indicating that Wade did not need to worry about the absence; and 4) cardiologists' concern about Josko's management of the CVS department. Doc. 24 at 13. None of this constitutes direct evidence of discrimination because a fact finder would be required to *infer*

from this evidence that age was the motivating factor behind Wade's termination. See Erickson v. Farmland Indus., Inc., 271 F.3d 718, 725 (8th Cir. 2001) (holding that evidence which depends on an inference to be viewed as evidence of age animus does not constitute direct evidence of age discrimination).

The annual performance evaluations indicate Wade was an able cardiac sonographer who was often praised for her technical skills, but they do not provide "evidence of a discriminatory attitude" on the part of Josko or a "discriminatory animus in the decisional process" to terminate her employment. King, 553 F.3d at 1161. Similarly, Wade's allegations that Josko discriminated against her by treating younger sonographers more favorably also requires a fact finder to infer discriminatory animus. Wade testified during her deposition that Josko did not make discriminatory comments regarding Wade's age:

> Q: Do you contend that at any point in time that Ms. Josko was your supervisor that she made a comment that she resented the fact that you were older than her since she was a supervisor?
> A: No, she did not make any said comments. It was the way she treated me.

Doc. 16-1 at 25. Allegations that Josko treated Wade differently than other employees but did not make discriminatory comments toward Wade do not "clearly point to the presence of an illegal motive" behind Wade's termination. Bone, 686 F.3d at 953 (internal quotation marks and alteration omitted). Rather, a fact-finder would have to infer that discriminatory animus was the reason Josko treated Wade differently than younger sonographers.

Wade also alleges that Josko made comments about Wade's higher salary. Doc. 16-1 at 26–27; Doc. 28 at ¶ 30. Wade testified during her deposition that Josko twice commented that Wade was paid a higher salary than Josko, one comment being made prior to Josko becoming Wade's supervisor. Doc. 16-1 at 26–27. Wade does not allege that either comment was made in

connection with the decision to terminate her employment, so such comments do not constitute direct evidence of discrimination. See King, 553 F.3d at 1160 ("We have held that stray remarks in the workplace, statements by nondecisionmakers, and statements by decisionmakers unrelated to the decisional process do not constitute direct evidence."). Moreover, comments about salary do not generally demonstrate a discriminatory attitude with respect to age. See Brown v. McDonnell Douglas Corp., 113 F.3d 139, 142 (8th Cir. 1997) ("It is well settled that employment decisions motivated by characteristics other than age (such as salary and pension benefits), even when such characteristics correlate with age, do not constitute age discrimination.") (internal quotation marks and alteration omitted).

Likewise, Wade's allegations that Josko set her up are not direct evidence of age discrimination. During her deposition, Wade testified that when she asked Josko about the consequences of missing the September 12, 2014 shift, Josko told Wade "it would be considered an unexcused absence, and [Josko] said, [']but you don't miss much work, don't worry about it.['] There was no talk about disciplinary action." Doc. 16-1 at 20. Viewing the facts in the light most favorable to Wade, this Court assumes Josko did tell Wade "not to worry about it" prior to Wade missing her September 12, 2014 shift. However, Josko telling Wade not to worry about an unexcused absence, and Wade subsequently being terminated, does not establish that Josko was motivated by an age-based discriminatory animus. Once again, a fact finder would have to infer the motive for Josko's actions, and when evidence requires such an inference it does not constitute direct evidence of discrimination. See Erickson, 271 F.3d at 725.

Finally, evidence that the cardiologists at SMC expressed concern about Josko's management of the CVS department is not direct evidence that Josko discriminated against Wade on the basis of her age. Some cardiologists expressed their dissatisfaction with Josko's

20

management of the CVS department prior to Wade's termination. Doc. 15 at ¶¶ 131–33; Doc. 26 at ¶¶ 131–33. After Wade's termination, one cardiologist, Dr. William Waltz (Dr. Waltz), wrote a letter sharply criticizing Josko and her management of the CVS department. Dr. Waltz described Josko as "vindictive with [Wade]" and claimed "[Josko's] plan to have [Wade] fired was apparent for years." Doc. 28-13 at 1. Dr. Waltz further described how Josko "continued to harass and intimidate [Wade]" and "created and still maintains a hostile work environment" which continued even after Wade's termination. Doc. 28-13 at 1. Nevertheless, Dr. Waltz's letter does not constitute direct evidence of age-based discrimination on the part of Josko. Indeed, Dr. Waltz provided an affidavit stating that "Josko did not do or say anything that led me [to] believe that the harassment, intimidation, and hostile environment I referenced in the letter I wrote at Wade's request was based on Wade's age." Doc. 35 at ¶ 5. A fact finder would have to infer that Josko's allegedly poor management of the CVS department and behavior toward Wade was the result of discriminatory animus, so Wade has failed to provide direct evidence of discrimination. See Erickson, 271 F.3d at 725.[9]

## 2. **McDonnell Douglas Standard**

---

[9] SMC argued that Wade's direct evidence claim also fails because Wade has not provided evidence that Josko had the authority to terminate Wade's employment or that Josko played a role in SMC's decision to terminate Wade's employment. Doc. 29 at 15. In general, a supervisor does not constitute an employer if that supervisor lacks authority to take tangible employment actions against the employee. See Merritt v. Albemarle Corp., 496 F.3d 880, 883 (8th Cir. 2007) (explaining that an employer can be held vicariously liable for the actions of a "supervisor" if that person had the power "to take tangible employment action against the victim" of harassment). When representatives of SMC were discussing what course of action to take with Wade on September 17, 2014, the vice president of Human Resources deferred the decision to others, including Josko. See Doc. 16-8 at 55 ("I will defer this one to Andy, Bridget and [Josko]"). Yet, it appears that Josko, despite the invitation from Haugan, did not participate in the decision to terminate Wade's employment beyond preparing the documentation that was submitted to Human Resources. Viewing the facts in the light most favorable to Wade, Josko appears to have had authority to take tangible employment action against Wade and at a minimum this is a question of fact, but Wade's argument of direct evidence of discrimination fails on other grounds.

Under the burden-shifting framework set forth in McDonnell Douglas, Wade has the initial burden of establishing a prima facie case of age discrimination by showing she: "(1) was at least forty years old, (2) suffered an adverse employment action, (3) was meeting [her] employer's legitimate expectations at the time of the adverse employment action, and (4) was replaced by someone substantially younger." Gibson v. Am. Greetings Corp., 670 F.3d 844, 856 (8th Cir. 2012) (quoting Morgan v. A.G. Edwards & Sons, Inc., 486 F.3d 1034, 1039 (8th Cir. 2007)). If Wade establishes a prima facie case, then the burden of production shifts to SMC to proffer legitimate, nondiscriminatory reasons for its actions. Onyiah v. St. Cloud State Univ., 684 F.3d 711, 719 (8th Cir. 2012). If SMC meets this burden, Wade must show that the proffered reasons were a pretext for age discrimination. Id. Wade at all times retains the "ultimate burden of persuasion that 'age was the "but-for" cause'" of SMC's adverse action. Id. (quoting Rahlf v. Mo-Tech Corp., 642 F.3d 633, 637 (8th Cir. 2011)).

Wade unquestionably was over forty years old and suffered an adverse employment action. SMC initially argued that Wade had failed to meet her burden of establishing the fourth prong of the prima facie case, but does not provide evidence disputing that Wade was replaced by someone substantially younger. Wade alleges that she was replaced by a sonographer "in his thirties" in an affidavit submitted as part of her opposition to SMC's motion for summary judgment. Doc. 28 at ¶ 33. This is sufficient evidence to meet her burden on this prong. See Riley v. Lance, Inc., 518 F.3d 996, 1000 (8th Cir. 2008) ("As to part four of the prima facie case, [employer] does not dispute [employee's] contention that he was replaced with a substantially younger person. That fact alone gives rise to the necessary inference of age discrimination."). Thus the primary issue regarding Wade's prima facie case is whether she was meeting her employer's legitimate expectations at the time she was terminated.

### · a. Employer's Legitimate Expectations

Wade argues that her annual performance evaluations, lack of salary-related penalties for attendance issues, and references from various physicians in Sanford's pediatric cardiac unit establish that she was meeting her employer's legitimate expectations. Doc. 24 at 14. However, Wade does not address her history of violating SMC's Attendance and Punctuality policy and the progressive discipline she faced for those infractions. Wade's reliance on her annual performance evaluations is unconvincing. SMC does not dispute that Wade was a capable sonographer and does not suggest that Wade was terminated for some issue with her technical skills. Doc. 17 at 15 n.3. Rather, SMC argues that Wade's termination resulted from her unexcused absence from her September 12, 2014 shift after a history of infractions of the Attendance and Punctuality policy, as well as failing to follow Josko's directive to attend screenings with Boone.

SMC's Attendance and Punctuality policy establishes that when "an employee does not meet the attendance expectations outlined, they will be subject to the progressive discipline process." Doc. 16-10 at 3. SMC's Discipline policy outlines the progressive discipline process, which progresses from verbal to written reminders, then to a DML, and culminates in termination. Doc. 16-11 at 3. The Discipline policy provides that employees placed on a DML "must decide during this leave whether they can commit to Sanford's expectations or choose to resign their position." Doc. 16-11 at 3. The Discipline policy further states that "[a]n employee may be terminated due to the frequency or nature of his or her violation of *policies* and/or continued failure to meet the performance expectations of their position." Doc. 16-11 at 3 (emphasis added). Wade received a verbal warning for violations of the Attendance and Punctuality policy in May of 2008, written warnings in December 2008 and October 2009, more verbal warnings in December of 2011 and November of 2012, and was placed on a DML in December of 2012. See Doc. 16-8 at 22–23,

25–29. Per the Discipline policy, termination was the next step in SMC's progressive discipline process.

While it appears that Wade fails to establish this prong of her prima facie case, one material factual dispute prevents this Court from granting SMC's motion for summary judgment at this phase of the McDonnell Douglas framework. Wade alleges that Josko, prior to Wade missing the September 12, 2014 shift, told Wade "not to worry about it." Doc. 16-1 at 20. Josko has no recollection of making this statement, and Wade did not mention any such statement by Josko when Wade made the written remarks on her termination documents, Doc. 16-13 at 3, but at this stage this Court takes the facts in the light most favorable to Wade. If Wade's supervisor told her not to worry about receiving an unexcused absence for missing work on September 12, there is a question of fact as to whether Wade was meeting her employer's legitimate expectations at the time she was terminated.

SMC also argues that Wade was not meeting the legitimate expectations of her employer when she failed to accompany Boone to a screening on September 16, 2014. It is undisputed that Wade told Josko she was not aware of the directive to accompany Boone because she was behind on reading her emails, Doc. 15 at ¶ 78; Doc. 26 at ¶ 78, and Wade also alleges that Dr. Theresa Stamato (Dr. Stamato) informed Wade that she did not need to accompany Boone that day, Doc. 28 at ¶ 67. SMC has provided evidence to establish that the pediatric cardiologists, such as Dr. Stamato who work at Sanford Clinic, do not schedule, hire, fire, discipline, or complete performance evaluations for the pediatric cardiac sonographers employed by SMC. Doc. 31 at ¶ 6. Rather, Wade was an employee of SMC and Josko was her supervisor. Doc. 15 at ¶ 82. In her Response to Statement of Genuine Disputes of Material Facts, Wade maintains that Dr. Stamato did have authority to excuse Wade from accompanying Boone, but Wade cites to no

24

record evidence to support this assertion. Doc. 26 at ¶ 83. Josko testified during her deposition that Dr. Stamato had previously mandated that Boone was not to scan on her own without another sonographer present. Doc. 16-5 at 13. If Dr. Stamato had authority to require that Boone be accompanied, there is at least a fact question whether Dr. Stamato also had authority to excuse a sonographer from accompanying Boone. Taking the facts in the light most favorable to Wade, there is a question of fact whether Wade was excused from accompanying Boone and thus was meeting her employer's legitimate expectations, so Wade has established a prima facie case of age discrimination under the McDonnell Douglas framework.

### b. Legitimate, Nondiscriminatory Reasons for Terminating Wade

Because Wade has established a prima facie case of age discrimination, the burden shifts to SMC to articulate a legitimate, nondiscriminatory reason for terminating Wade's employment. Onyiah, 684 F.3d at 719. The burden to articulate a nondiscriminatory reason is not onerous. Buchholz v. Rockwell Int'l Corp., 120 F.3d 146, 150 (8th Cir. 1997); see also Krenik v. Cty. of Le Sueur, 47 F.3d 953, 958 (8th Cir. 1995) ("This is a burden of production not proof. The defendant need not persuade the court, it must simply provide evidence sufficient to sustain a judgment in its favor.").

SMC has met this burden. As the previous section details, SMC maintains that Wade both violated SMC's Attendance and Punctuality policy and failed to follow the instructions of her supervisor to accompany Boone while Wade was on back up call. Wade has a documented history of discipline for tardiness, as prescribed by SMC's progressive discipline process, which includes verbal and written warnings, as well as a DML. See Doc. 16-8 at 22–23, 25–29; Doc. 16-13. Wade testified that Josko informed her that it would be considered an unexcused absence to miss her September 12, 2014 shift. Doc. 16-1 at 21. SMC has provided evidence that Josko instructed

the pediatric cardiac sonographers on September 3, 2014, that the sonographer on back up call was to accompany Boone to the hospital, Doc. 16-8 at 51, and that Wade when on back up call did not accompany Boone on September 16, 2014, Doc. 15 at ¶ 77; Doc. 26 at ¶ 77. The Eighth Circuit has "consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee." Ebersole v. Novo Nordisk, Inc., 758 F.3d 917, 925 (8th Cir. 2014) (quoting Twymon v. Wells Fargo & Co., 462 F.3d 925, 935 (8th Cir. 2006)). Thus, SMC has met its burden at this stage of articulating a legitimate, nondiscriminatory reason for terminating Wade's employment.

### c. Pretext

Because SMC has provided legitimate, nondiscriminatory reasons for terminating Wade's employment, the burden shifts back to Wade to establish pretext. Although there are multiple ways to demonstrate pretext, plaintiffs typically do so by offering evidence that the employer's rationale is "unworthy of credence . . . because it has no basis in fact" or that "a [prohibited] reason more likely motivated the employer." Torgerson, 643 F.3d at 1047 (alteration in original) (quoting Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006)). To survive summary judgment at this stage, Wade must "present evidence, that considered in its entirety (1) creates a fact issue as to whether [SMC's] proffered reasons are pretextual and (2) creates a reasonable inference that age was a determinative factor in the adverse employment decision." Tusing, 639 F.3d at 516 (quoting Wingate v. Gage Cty. Sch. Dist., No. 34, 528 F.3d 1074, 1079 (8th Cir. 2008)).

Wade has not met her burden. To argue that SMC's proffered reasons are pretextual, Wade relies heavily on her history of good annual performance evaluations. Wade asserts that because she "never received any negative reviews in her annual reports for tardiness" and that her

performance evaluations "all indicate that she met, or exceeded, Sanford's expectations[,]" there are genuine issues of fact as to whether SMC's proffered justifications are pretext. Doc. 24 at 15–16. Wade cites to this Court's opinion in Dunn v. Lyman School District 42-1, 35 F. Supp. 3d 1068 (D.S.D. 2014), in support of her argument. In Dunn, the defendant school district asserted that the decision not to renew the plaintiff's contract was based upon various concerns with the plaintiff's job performance. Id. at 1085. While noting that Eighth Circuit precedent establishes that a history of good performance reviews does not alone create a genuine issue of material fact regarding pretext, this Court denied the defendant school district's motion for summary judgment. Id. at 1085–86. In doing so, this Court found that the plaintiff's history of strong performance reviews, in conjunction with the absence of documented performance problems or warnings by the defendant school district to the plaintiff regarding those issues, constituted evidence of possible pretext. Id. at 1086.

Wade's case is distinguishable from Dunn. While Wade is correct that her annual performance evaluations all reflect that she met or exceeded (indeed at times with "outstanding performance") SMC's expectations, those evaluative categories did not include punctuality and thus do not contradict her documented history of discipline for infractions of the Attendance and Punctuality policy. Moreover, Wade is incorrect in asserting that her evaluations make no mention of her issues with the Attendance and Punctuality policy. Wade's 2009 evaluation documented the December 2008 written warning, Doc. 30-5 at 3; her 2010 evaluation noted that she received another written warning in October of 2009, Doc. 28-4 at 11; her 2012 evaluation stated that Wade was asked to work on her punctuality, Doc. 26-6 at 8; her 2013 evaluation recorded that Wade was placed on a DML in December of 2012 for excessive tardiness, Doc. 28-7 at 7; and her 2014 evaluation stated that Wade "continues to struggle with time management," Doc. 28-8 at 8. As

opposed to the dearth of documented performance issues in Dunn, Wade's issues with respect to SMC's Attendance and Punctuality policy are well documented and follow the progressive discipline process established in SMC's Disciplinary policy. See Doc. 16-8 at 22–23, 25–29. The fact that Wade received good, and even excellent, reviews regarding her technical skills as a sonographer, and that physicians at Sanford provided glowing recommendations of her, do not create a fact issue as to whether SMC's rationale that Wade was terminated for violating the Attendance and Punctuality policy was merely pretext. There is undisputed evidence that Wade was disciplined multiple times for violations of the Attendance and Punctuality policy prior to her termination; that she was at the last step in the progressive discipline process prior to her termination; and that she was terminated after missing her scheduled shift on September 12, 2014, and not accompanying Boone to the hospital when Wade was on back up call. In light of these undisputed facts, the presence of positive performance evaluations does not create a genuine issue of material fact regarding pretext. See Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1137–38 (8th Cir. 2006) ("While favorable performance reviews sometimes provide evidence of pretext, . . . we agree with the district court that receipt of positive reviews in the past, in and of itself, does not necessarily raise an inference of age discrimination.") (internal quotation marks and citations omitted); Rose-Matson v. NME Hosps., Inc., 133 F.3d 1104, 1109 (8th Cir. 1998) (explaining that while employee's performance evaluations may demonstrate that employee performed well in the past, they did "not render her more recent negative evaluations inherently untrustworthy").

Wade has also failed to present evidence which "creates a reasonable inference that age was a determinative factor" in the decision to terminate her employment. Tusing, 639 F.3d at 516. In an attempt to create such an inference, Wade alleges that Josko discriminated against Wade and treated younger sonographers more favorably, that all the sonographers in the pediatric unit were

28

routinely tardy but Wade alone was punished for it, that nobody else in the unit had been terminated for being tardy, and that Hargreaves was punished less severely for the same conduct which resulted in Wade's termination. However, the evidence in the record belies these allegations or any inference that age was a factor in the decision to terminate Wade.

Wade asserts that Josko discriminated against her due to her age and treated younger technicians more favorably and that Josko complained to Wade about the difference in their salaries and ages, as well as disliking supervising someone who was older. Doc. 24 at 13; Doc. 28 at ¶ 30. However, Wade's contentions are refuted by her own deposition testimony. During her deposition, Wade was specifically asked about Josko's alleged comments regarding age:

> Q: Do you contend that at any point in time that Ms. Josko was your supervisor that she made a comment that she resented the fact that you were older than her since she was a supervisor?
>
> A: No, she did not make any said comments. It was the way she treated me.

Doc. 16-1 at 25. In her affidavit opposing SMC's motion for summary judgment, Wade stated that "I don't recall the specific representations that she made, but I do recall feeling that she did not like the fact that I was older than she was or that I had as much experience as I did in the unit." Doc. 28 at ¶ 30. As an initial matter, Wade may not rest on an affidavit or a contention in her brief alleging Josko made age-based discriminatory comments when her deposition testimony directly contradicts that allegation. See City of St. Joseph v. Sw. Bell Tel., 439 F.3d 468, 476 (8th Cir. 2006) (explaining that a party may not create a genuine issue of material fact to defeat summary judgment by submitting an affidavit that contradicts earlier deposition testimony). Wade testified that Josko did not make comments that she resented the fact that Wade was older, but rather expressed a feeling that Josko resented her age. But these feelings do not constitute evidence of

29

discriminatory animus. See Reasonover, 447 F.3d at 578 ("Evidence, not contentions, avoids summary judgment.").

Josko's alleged comments about Wade's higher salary also fail to establish pretext on the part of SMC in terminating Wade's employment. As explained in Part III.A.1 above, comments about salary are not direct evidence of discrimination. Brown, 113 F.3d at 142. Similarly, these isolated comments—about a characteristic that is at best only correlated with age and unrelated to the decision to terminate Wade's employment—do not demonstrate pretext on the part of SMC. See Kneibert v. Thomson Newspapers, Mi. Inc., 129 F.3d 444, 454 (8th Cir. 1997) (commenting that "evidence that an employer takes an adverse employment action against an employee due to that employee's higher salary does not necessarily support an inference of age discrimination" and finding the plaintiff had failed to establish a connection between his demotion and age where he had received repeated warnings about his performance and his employer had made one alleged comment that the plaintiff "was making too much money"); see also Erenberg v. Methodist Hosp., 240 F. Supp. 2d 1022, 1033 (D. Minn. 2003) (finding that "[c]ase law supports the notion that isolated comments that are remote in time and not related to the employment decision are insufficient to establish pretext for discrimination"). In Wade's case, there is no evidence that the decision to terminate Wade had any connection to her salary or any comments made by Josko about her salary. As a matter of law, Josko's alleged comments do not support an inference of age discrimination.

In further support of her contention that Josko discriminated against her, Wade alleges that Josko "set her up" by 1) making her feel like a DML was of little consequence by telling Wade that she, Josko, had received a DML herself prior to being promoted and 2) telling Wade "not to worry" about missing her scheduled shift on September 12, 2014. Doc. 24 at 13. During her

deposition, Wade testified that at some point after being placed on a DML in December of 2012 she called in to work—pursuant to her action plan—to inform Josko that she would be late due to snow. Doc. 16-1 at 18. Wade further testified that Josko told her at that time it was no longer necessary to call in and that Josko "had been through the decision-making leave herself for tardiness and not to worry about it."[10] Doc. 16-1 at 18. Wade did not give a date as to when this conversation took place, but it must have been well before Wade's termination in September of 2014 because snow was the factor making Wade late to work. Such a comment, even when considered together with Josko reportedly telling Wade "not to worry" about missing her September 12, 2014 shift, does not give rise to an inference of age-based discrimination. Additionally, Wade's assertion that Josko was setting her up by telling her not to worry about missing her shift is undermined by Wade's own testimony.

> Q: And during that phone call Ms. Josko told you that if you were not at work on Friday, September 12, it would be considered an unexcused absence?
>
> A: No. We talked at the clinic. It was in-person. It wasn't—I tried calling Sandy on my way home, and she didn't answer. When she told me that it would be—I asked her what would happen if I wasn't there, and she said it would be considered an unexcused absence, and she said, but you don't miss much work, don't worry about it. There was no talk about disciplinary action.
>
>         .   .   .
>
> Q: Okay. Did you specifically ask Ms. Josko whether you would be disciplined for an unexcused absence?
>
> A: No. I asked her—I said, so if I don't come, what will happen? She said[] it will be counted as an unexcused absence. And I just didn't miss that kind of work, so it's the first time ever I've not been able to cover a shift I was covered [sic] for, so . . . I assumed I would be talked to for having missed, but there was no talk of discipline.
>
>         .   .   .

---

[10] Josko testified that she never received a DML, Doc. 16-5 at 9, and SMC's documentation corroborates Josko's testimony. Doc. 33 at ¶ 12. However, the fact that Josko never received a DML does not establish that she did or did not make the statement alleged by Wade.

| Q: | [Y]ou clearly understood on the basis of that conversation that if you did not work your shift on Friday, September 12, that it would be an unapproved absence? |
| A: | Yes. |
| Q: | And did you specifically ask Ms. Josko, will this result in any discipline? |
| A: | No, I did not. |
| Q: | And did Ms. Josko tell you that this will not result in any discipline? |
| A: | No. |

Doc. 16-1 at 20–21. Despite Wade's contention that Josko was setting her up, Wade's testimony makes clear that Josko informed Wade that missing her shift would be considered an unexcused absence and that Josko said nothing about whether Wade would be disciplined. Even considered in the light most favorable to Wade, these facts do not support an inference of discrimination.

Wade also alleges that younger sonographers were treated more favorably by Josko. In her Response to Statement of Genuine Disputes of Material Fact, Wade cites to paragraph 54 of her affidavit in alleging that younger sonographers were routinely tardy and did not receive a DML. Doc. 26 at ¶¶ 29–36. That paragraph in the affidavit alleges that Hargreaves was routinely tardy for work and also missed work on several occasions for personal reasons, yet did not receive a DML. Doc. 28 at ¶ 54. In her brief in opposition to SMC's motion, Wade alleges that "all the technicians in the pediatric unit were routinely tardy for clocking into work." Doc. 24 at 16. Wade has provided no evidence that the other sonographers in the pediatric cardiac unit were routinely tardy and not disciplined, thus she cannot rely on this conclusory allegation to avoid summary judgment. See Rose-Matson, 133 F.3d at 1109 (holding that the plaintiff's claims that she was treated differently than similarly situated employees by being subjected to a different evaluation process than her fellow employees did not create a genuine issue of material fact precluding summary judgment because "unsubstantiated and conclusory allegations are insufficient to support an inference of pretext"). For this same reason, Wade cannot create an inference of pretext by

32

asserting, as she does in her affidavit, that "Josko would favor the younger techs in the pediatric cardiac unit, who[] were in their early to mid-thirties, and treated them more fairly than she treated me." Doc. 28 at ¶ 32. Because Wade has not substantiated this claim, she has failed to create an inference of pretext.

The only concrete example of disparate treatment Wade provides is the written warning Hargreaves received in the summer of 2014 for missing a scheduled shift. As detailed in Part I.B above, Hargreaves was issued a written warning on July 11, 2014, for missing her scheduled shift on June 26, 2014. At that time, Hargreaves had received three prior verbal warnings, but no written warnings and no DML. Doc. 16-9 at 14. This fact is fatal to Wade's contention that Hargreaves's written warning is evidence of pretext. "At the pretext stage, 'the test for determining whether employees are similarly situated to a plaintiff is a rigorous one[,]' [and Wade] must show that she and [Hargreaves] were 'similarly situated in all relevant respects.'" Bone, 686 F.3d at 956 (quoting Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 853 (8th Cir. 2005)). Wade and Hargreaves were not similarly situated in all relevant respects because Hargreaves was not at the same step in SMC's progressive discipline process as Wade. At the time of her termination, Wade had received three verbal warnings and two written warnings, and been placed on a DML, which was the final step in the progressive discipline process before termination. In addition, there is no allegation that Hargreaves also failed to accompany Boone while on back up call. See Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000) ("[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and *engaged in the same conduct* without any mitigating or distinguishing circumstances.") (emphasis added). Hargreaves, as a matter of law, is not a valid comparator and thus Wade cannot create an inference that discrimination motivated

SMC's decision to terminate her employment by pointing to disparate treatment between herself and Hargreaves.[11]

Beyond the above analysis, there is additional evidence in the record which undermines Wade's assertion that she was treated less favorably than the younger pediatric cardiac sonographers. Hargreaves—who was under forty years old—made very similar complaints about Josko's management when she received her written warning and at the time of her voluntary resignation from SMC as Wade has alleged in this case. See Doc. 16-9 at 17–19; Doc. 16-19 at 9. Relatedly, Judy Hruska, a pediatric cardiac sonographer who worked under Josko and was over the age of forty, submitted an affidavit explaining that her decision to retire was not related to any harassment and that during the time Josko was her supervisor, Hruska was not treated unfairly by Josko, harassed by Josko, or discriminated against by Josko on the basis of her age. Doc. 32 at ¶¶ 4–5. Of course the fact that one individual in a protected class did not face discrimination does not lead to the conclusion that no member of that protected class faced discrimination. See, e.g., Hively v. Ivy Tech Cmty. Coll. of Ind., 853 F.3d 339, 346 n.3 (7th Cir. 2017) ("[T]he Supreme Court has made it clear that a policy need not affect *every* woman to constitute sex discrimination.") (emphasis in original). But in Wade's case, a younger employee making very similar claims about Josko as Wade alleges and an employee in the protected age category disclaiming any suggestion of unfair treatment or age discrimination, coupled with the lack of other evidence to suggest Josko was motived by a discriminatory animus against Wade, combine

---

[11] As detailed in Part I.A above, Kramer's September 17, 2014 email requesting input on what disciplinary action to take with Wade mentions that "[w]e have had a couple other situations within Sanford in which we gave the employees an additional DML if time had passed since the previous." Doc. 16-8 at 53. Wade does not allege pretext based on other employees at SMC receiving a second DML rather than termination. Indeed, such a contention would fail because Wade has not produced evidence establishing that she was "similarly situated in all relevant respects" to these employees. Bone, 686 F.3d at 956.

to suggest that Wade's claims of age-based discrimination do not withstand a motion for summary judgment. Next, despite Wade's contention to the contrary, other employees at SMC (though apparently not from the pediatric cardiac sonography unit) have been terminated for violations of the Attendance and Punctuality policy. See Doc. 16-9 at 20–38. Finally, Wade contends that Josko is the only employee of SMC who discriminated against her, but Josko was not Wade's supervisor when Wade received her first verbal warning and first and second written warnings for violating the Attendance and Punctuality policy.

The evidence Wade has presented establishes that she was a skilled pediatric cardiac sonographer who was valued by the physicians with whom she worked. Wade has also presented evidence that Josko may have been a poor manager and unreasonably rigid in failing to explore options to accommodate the vacation requests of various employees under her supervision. However, Wade has not presented evidence which suggests that SMC's rationale for terminating Wade is mere pretext, and this Court is not empowered to punish SMC for making poor business decisions. See Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995) ("It has become a commonplace for this court to observe . . . that the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."). Because Wade has not presented direct evidence of age-based discrimination, and because she cannot satisfy her burden under the McDonnell Douglas framework, SMC is entitled to summary judgment on Wade's ADEA claim.

### B. Hostile Work Environment

To prove a claim of hostile work environment based on age, Wade must show "(1) [she] belongs to a protected group[;] (2) [she] was subjected to unwelcome harassment based on age . .

35

. [;] (3) the harassment affected a term, condition, or privilege of [her] employment; (4) [her] employer knew or should have known of the harassment; [12] and (5) the employer failed to take proper action." Rickard v. Swedish Match N. Am., Inc., 773 F.3d 181, 184 (8th Cir. 2014) (quoting Peterson v. Scott Cty., 406 F.3d 515, 523–24 (8th Cir. 2005)). To determine whether the harassment affected a term, condition, or privilege of employment, a court must "consider the totality of the circumstances, including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with [the employee's] job performance." Sellers v. Deere & Co., 791 F.3d 938, 945 (8th Cir. 2015) (internal quotation

---

[12] The Eighth Circuit has explained that the element requiring that the employer knew or should have known of the harassment is required "[w]hen the alleged harasser is the plaintiff's fellow employee" but that it does not apply to allegations of "supervisory harassment." Ryan v. Capital Contractors, Inc., 679 F.3d 772, 778 (8th Cir. 2012) (citing Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 566 n.5 (8th Cir. 2000)). An employer is vicariously liable for harassment by a supervisor, but in order to be considered a supervisor, "the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties." Id. at 778–79. As explained in a footnote in Part III.A.1 above, there is at least a fact question as to whether Josko fits the Eighth Circuit's definition of a "supervisor." Wade admits that she did not report allegations that Josko was discriminating against her on the basis of her age. Doc. 15 at ¶ 124; Doc. 26 at ¶ 124. Wade instead alleges that Andy Munce (Munce), a vice president at Sanford, required Josko to complete a Hogan Management Assessment because Josko had issues working with Wade, Doc. 28 at ¶ 34, and that Josko's treatment of Wade was "noticed by the physicians at Sanford," Doc. 28 at ¶ 41. In an affidavit, Munce stated that Wade never reported to him that Josko was treating her differently than other employees on the basis of age, or that Josko was harassing Wade or creating a hostile work environment based on Wade's age. Doc. 31 at ¶¶ 9–10. Dr. Waltz, who wrote in a letter that Josko harassed and intimidated Wade and fomented a hostile work environment, signed an affidavit stating that he did not believe Josko's actions were based on Wade's age. The physicians referenced in Wade's affidavit, including Dr. Waltz, are employed by Sanford Clinic, not SMC. Doc. 35 at ¶ 1. If somehow Josko was not a "supervisor" under Eighth Circuit precedent and Wade was required to establish the fourth element of a hostile work environment claim, her claim would likely fail because her representations to Munce that "[Josko] had put us in between a rock and a hard place and that it was very hard to do the things needed in the peds program" would not satisfy her requirement to show that SMC knew of alleged harassment by Josko. Doc. 16-1 at 28. However, because Wade cannot satisfy the second or third element of a hostile work environment claim, this Court need not resolve whether Wade needs to or has met the fourth element of such a claim.

marks omitted). This element "involves both objective and subjective components" and "requires that the harassment be severe or pervasive enough to create an objectively hostile or abusive work environment and the victim must subjectively believe her working conditions have been altered." Moses v. Dassault Falcon Jet-Wilmington Corp, 894 F.3d 911, 922 (8th Cir. 2018) (internal quotation marks and alterations omitted).

"The Supreme Court has cautioned courts to be alert for workplace behavior that does not rise to the level of actionable harassment." Al-Zubaidy v. TEK Indus., Inc., 406 F.3d 1030, 1038 (8th Cir. 2005). The standards for a hostile work environment claim are stringent and meant to "filter out complaints attacking the ordinary tribulations of the workplace, such as sporadic use of abusive language . . . and occasional teasing." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). Wade is required to show "that the alleged harassment was so intimidating, offensive, or hostile that it 'poisoned the work environment.'" Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999) (quoting Scott v. Sears, Roebuck & Co., 798 F.2d 210, 214 (7th Cir. 1986)).

Wade's hostile work environment claim weaves together the allegations of discrimination by Josko as discussed above, with several actions by Josko allegedly intended to undermine Wade's position in the pediatric cardiac sonography unit. The allegations of discrimination discussed above do not create a reasonable inference of discriminatory animus based on age and need not be reanalyzed here. In order to consider the "totality of the circumstances" in evaluating Wade's hostile work environment claim, however, this Court does consider those allegations, along with Wade's allegations that Josko worked to undermine her position. Sellers, 791 F.3d at 945. When viewed in totality, these cumulative actions as a matter of law fail to satisfy the elements of a hostile work environment claim because there is no basis to conclude that Josko

harassed Wade because of her age or that any actions of Josko affected a term, condition, or privilege of Wade's employment.

Josko's actions allegedly taken to undermine Wade's position can be categorized as either favoring younger technicians or otherwise acting vindictively toward Wade. As to the first category, Wade alleges that Josko treated younger sonographers more favorably and created a hostile work environment, Doc. 28 at ¶¶ 31–32, that Josko would "disregard" Wade and give other employees leadership roles despite Wade being lead tech, Doc. 28 at ¶ 34, and that Josko would "bypass [Wade] on new developments" and would instead go to younger sonographers, Doc. 28 at ¶ 36. Wade's allegations that younger techs were treated more favorably are not substantiated by any evidence in the record, and such "unsubstantiated and conclusory allegations" are insufficient to satisfy her burden of showing she was harassed on the basis of her age. See Rose-Matson, 133 F.3d at 1109.

As to being disregarded and passed over for leadership roles, Wade points primarily to Salzwedel being tasked with training the other sonographers in the pediatric cardiac unit in maternal fetal medicine (MFM). Doc. 16-1 at 29. Salzwedel had obtained a certificate in fetal echocardiography that none of the other sonographers possessed. Doc. 16-9 at 49. Nevertheless, Wade asserts that being the formal preceptor in the unit, the task of training the other pediatric cardiac sonographers in MFM should have fallen to her instead. Doc. 16-9 at 29. Wade testified that the preceptor's duty was to train new employees of the pediatric unit, for which she received additional compensation during the time she was training. Doc. 15 at ¶ 4; Doc. 26 at ¶ 4; Doc. 16-1 at 29. Salzwedel did not receive additional compensation to conduct this internal MFM training and was training current, not new, employees. Doc. 16-1 at 29. Thus, the decision to have a sonographer who possessed a specific certification to conduct internal MFM training of the

pediatric cardiac sonography unit without additional compensation did not affect a "term, condition, or privilege" of Wade's employment. Rickard, 773 F.3d at 184.

Wade also points to quality assurance projects and the development of a peer review process—apparently tasked to other, younger sonographers—as examples of being bypassed for leadership roles. Wade testified that Salzwedel was tasked with the pediatric cardiac sonography unit's quality assurance projects, and that Wade and other younger sonographers sought to be trained to do quality assurance projects while Salzwedel was on maternity leave. Doc. 16-1 at 6, 29. According to Wade, neither she nor any of the younger sonographers who requested that training received it. Doc. 16-1 at 6, 29. Importantly, Wade testified that when this training request was made, "[Salzwedel] said no, and [Josko] didn't push it at all." Doc. 16-1 at 6. This allegation fails to support a hostile work environment claim for two reasons. First, it was apparently Salzwedel that rejected the request by Wade to be trained to complete quality assurance projects, not Josko, who is the only individual at SMC that Wade alleges discriminated against her. Second, there is no disparate treatment between Wade and the younger sonographers who also did not receive this requested training. As for the peer review process, Wade testified that although Bohnenberger was tasked with developing the peer review process, SMC "didn't ever start doing the peer reviews for pediatrics." Doc. 16-1 at 6. Wade's hostile work environment claim cannot withstand summary judgment on the basis that a younger sonographer, rather than Wade, was tasked with developing a peer review process that was apparently never used at SMC, for such an allegation, even if true, did not affect a "term, condition, or privilege" of Wade's employment. Rickard, 773 F.3d at 184. Moreover, even if that peer review process had been implemented at SMC, the allegation still would not support Wade's hostile work environment claim because assigning internal process development tasks to other sonographers in the pediatric cardiac

sonography unit did not undermine Wade's position as the formal preceptor—duties for which Wade received additional compensation—which would conceivably affect a condition of Wade's employment. The fact that Wade was lead tech did not mean that the other, younger sonographers in the pediatric cardiac sonography unit had to be deprived of all workplace development opportunities at SMC, but that is essentially what Wade is arguing here. Wade was still tasked with lead tech duties and her position as the formal preceptor—a position which actually entitled Wade to additional compensation—was not undermined when younger sonographers received workplace opportunities. As a matter of law, these allegations do not support a hostile work environment claim.

Finally, Wade's allegations that Josko would "bypass" her on new developments and instead go to younger sonographers are refuted by the record evidence and would not amount to harassment sufficient to satisfy a hostile work environment claim even if the allegations were true. Wade contends that Josko would intentionally schedule Wade in the adult lab at the same time Josko scheduled the pediatric cardiac sonography unit meetings where she typically disseminated information on new developments. Doc. 16-1 at 29; Doc. 28 at ¶ 37. However, Wade could not identify any specific meetings from which she was excluded during her deposition, and SMC has produced the minutes from 11 pediatric cardiac unit meetings that took place between 2011 and 2014, which show Wade either attended the meeting, had the day off, or was scheduled to work in the pediatric cardiac unit. Doc. 16-9 at 65–82. Wade was not scheduled to work in the adult lab during any of these meetings. Moreover, during her deposition Wade specifically denied lacking the knowledge and information necessary to perform her job because of these alleged missed meetings, and she admitted that she was never disciplined for not attending a meeting, her pay was not impacted for missing any meetings, and she was able to complete all of her continuing

40

education requirements. Doc. 15 at ¶ 161; Doc. 16-1 at 29–30; Doc. 26 at ¶ 161. Therefore, even assuming Wade did miss some pediatric cardiac sonography unit meetings because she was scheduled in the adult lab, she cannot claim that this "unreasonably interfere[d] with [her] job performance." Sellers, 791 F.3d at 945.

The allegations Wade makes regarding Josko's behavior, which this Court characterizes as Wade's allegations of vindictive treatment by Josko, include three primary contentions: 1) that Josko "refuted" Wade's ideas for developments and procedures in the pediatric cardiac sonography unit, Doc. 28 at ¶ 38; 2) that Josko rarely scheduled Wade for lead tech time, hindering her ability to accomplish her job, Doc. 28 at ¶ 62; and 3) that Josko frequently changed the call schedule which required Wade to switch with coworkers to accommodate vacation days Wade had requested months in advance, Doc. 28 at ¶ 39. None of these arguments however establish a viable hostile work environment claim.

During her deposition, Wade was unable to identify any ideas she had brought forth regarding developments or procedures for the pediatric cardiac unit which the physicians at Sanford supported but Josko rejected. Doc. 15 at ¶ 163; Doc. 16-1 at 30; Doc. 26 at ¶ 163. To support her allegation, Wade submitted an email, dated December 12, 2013, in which Wade requested that Josko schedule her for more lead tech time in order to work on various projects for the physicians. Doc. 28-14. Josko's response to Wade is "[t]hanks for bringing those issues up, Diane. You have my complete support." Doc. 28-14. While this email demonstrates that Wade had designs to work on what can be characterized as procedures and developments for the pediatric cardiac unit, it does not demonstrate that Josko "refuted" these ideas. To the contrary, Josko replied that Wade had her "complete support" in accomplishing these tasks. The email does not

constitute evidence of a hostile work environment, and unsubstantiated allegations by Wade that Josko "refuted" her ideas do not suffice to prevent summary judgment.

In support of the allegation that Josko would not schedule her sufficient lead tech time, Wade points to the December 12, 2013 email and a conversation with Munce which resulted in Josko completing a Hogan Management Assessment. Doc. 16-1 at 23. Wade testified at her deposition that the December 2013 email was sent because the physicians she worked with "were not happy [Wade] wasn't getting things done" that they wanted her to complete, which Wade attributed to not being scheduled adequate lead tech time. Doc. 16-1 at 23. Wade further testified that Salzwedel and Bohnenberger were scheduled time to complete the quality assurance projects and peer review process. Doc. 16-1 at 23. SMC has produced evidence that after Wade's email, she was scheduled for lead tech time on December 31, 2013, and again in 2014 on January 3, February 4, March 11 and 24, and on April 1. Doc. 16-9 at 43–44, 58–60. When Wade spoke to Munce, she did not directly tell that Josko was failing to schedule Wade for enough lead tech time, but instead told Munce that "[Josko] had put us between a rock and a hard place and that it was very hard to do the things needed in the peds program." Doc. 16-1 at 28. Munce's affidavit states that he did not require Josko to complete the Hogan Management Assessment because of any complaints by Wade of discrimination or harassment. Doc. 31 at ¶ 13. However, even when taking the facts in the light most favorable to Wade, the allegations that Josko impeded Wade's ability to do her job by scheduling her insufficient lead tech time do not support a claim for hostile work environment because this is not harassment that "was so intimidating, offensive, or hostile that it poisoned the work environment." Scusa, 181 F.3d at 967 (internal quotation marks omitted). When Wade made a specific request for lead tech time, she was scheduled for it. Moreover, the fact that Salzwedel and Bohnenberger were scheduled time to work on quality assurance projects

42

and the peer review program does not demonstrate that Wade was not scheduled lead tech time because of her age. Like with Hargreaves's missed shift, Salzwedel and Bohnenberger were not similarly situated to Wade in all relevant respects, so this alleged differential treatment fails to support an inference of discrimination. Bone, 686 F.3d at 956.

Finally, while Wade alleges that Josko "frequently" changed the call schedule, she attempts to substantiate this claim only with the call schedule revision from 2014. As detailed in Part I.B above, two cardiac sonographers left the pediatric cardiac sonography unit after Josko had set the 2014 call schedule and Wade's daughter had scheduled her wedding for a weekend in August of 2014 when Wade was not originally scheduled to be on call. Doc. 15 at ¶ 173; Doc. 26 at ¶ 173. This necessitated a revision of the call schedule because SMC has a policy of having one pediatric cardiac sonographer on call every evening, weekend, and holiday. Doc. 15 at ¶ 170; Doc. 26 at ¶ 170. Wade does not deny that two pediatric cardiac sonographers left SMC after the 2014 call schedule was originally set, necessitating a new call schedule. Wade maintains that she had requested PTO on that weekend and that Josko instructed her that she would need to find someone to work her shift if she wanted to attend her daughter's wedding. Though insensitive and heartless, Josko's actions and response do not establish a hostile work environment claim. Wade was able to switch with a coworker and attend her daughter's wedding. Doc. 16-1 at 8. Even taking the facts in the light most favorable to Wade and assuming Wade had requested PTO and that Josko was callously indifferent to the scheduling conflict, such "rude or unpleasant" conduct is "not severe enough to affect the terms, conditions, or privileges of [Wade's] employment." Moses, 894 F.3d at 923 (internal quotation marks omitted).

In addition to the allegations made in her affidavit and complaint, Wade also contends in her brief in opposition to SMC's motion for summary judgment that Josko "subject[ed] [Wade] to

ridicule." Doc. 24 at 9. Wade makes no specific allegations about being subjected to ridicule, and thus she cannot support her hostile work environment claim with this contention. See Reasonover 447 F.3d at 578 ("Evidence, not contentions, avoids summary judgment.").

Under the totality of the circumstances, Wade's hostile work environment claim does not survive summary judgment because none of the harassment to which she was allegedly subjected was motivated by her age or affected a term, condition, or privilege of her employment. There is evidence in the record that Josko and Wade had workplace issues and that Josko may at times have made Wade's life difficult. However, this type of frustrating work situation does not constitute harassment sufficient to maintain a hostile work environment claim, but is rather akin to the "ordinary tribulations of the workplace" which the stringent hostile work environment standards are meant to "filter out" from federal court claims. Faragher, 524 U.S. at 788. Indeed, the Eighth Circuit and this Court have previously granted summary judgment on hostile work environment claims involving more severe conduct than Wade has alleged here. See Rickard, 773 F.3d at 185 (granting summary judgment in favor of defendant on an age-based hostile work environment claim where claims of harassment included unfairly scrutinizing plaintiff's work relative to younger employees, disparaging comments about plaintiff's age, and crude conduct by plaintiff's supervisor including nipple pinching and rubbing plaintiff's towel on supervisor's crotch); Peterson v. Scott Cty., 406 F.3d 515, 523–24 (8th Cir. 2005) (granting summary judgment in favor of defendant on an age and sex-based hostile work environment claim where supervisor repeatedly referred to "old ladies," coworkers commented that women were lazy, and the plaintiff's supervisor refused to train her because of her age), abrogated on other grounds by Torgerson, 643 F.3d at 1043; Newell v. Speer, 3:15-CV-3006-RAL, 2017 WL 4838303, *5–11 (D.S.D. Oct. 24, 2017) (granting summary judgment in favor of defendant on a race-based hostile work

environment claim where racial epithets had been used in the workplace, plaintiff had a previous EEOC ruling in his favor that he had been unlawfully retaliated against, and some evidence suggested plaintiff's supervisors preferred to retain a non-minority coworker in the position plaintiff shared in the event of a reduction in force). SMC is entitled to summary judgment on Wade's hostile work environment claim.

### C. Intentional Infliction of Emotional Distress[13]

Wade alleges intentional infliction of emotional distress in Count III of her Complaint. Under South Dakota law, a plaintiff alleging intentional infliction of emotional distress must show

---

[13] Because summary judgment is granted as to Wade's federal claims in this case invoking federal jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), this Court has discretion to "decline to exercise supplemental jurisdiction" over Wade's remaining state law claims. 28 U.S.C. § 1367(c)(3). While purely state law claims involving non-diverse parties typically are to be litigated in state courts, this Court must determine whether it is appropriate to exercise pendent jurisdiction over Wade's state law claims. The Supreme Court has instructed that "if the federal claims are dismissed before trial . . . the state claims should be dismissed as well." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966). However, this is not "a mandatory rule to be applied inflexibly in all cases." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988). Instead, the pendent jurisdiction doctrine compels this Court to consider various factors—judicial economy, convenience, fairness, and comity—to determine whether the exercise of jurisdiction over Wade's state law claims is appropriate. Id. That question is easily answered here. Under South Dakota law, Wade's claims of intentional and negligent infliction of emotional distress are actions for personal injury, and thus have a three-year statute of limitations. See SDCL § 15-2-14(3); see also Stormo v. City of Sioux Falls, No. Civ. 12-4057-KES, 2012 WL 5879438, *4 (D.S.D. Nov. 21, 2012) (finding that "the torts of negligence, intentional infliction of emotional distress, and malicious prosecution are actions for personal injury" subject to the three-year statute of limitations under SDCL § 15-2-14(3)). Wade was terminated in September of 2014 and was required to file a complaint with the EEOC before bringing her federal claims to this Court. The factors of judicial economy, convenience, and fairness all militate in favor of this Court exercising pendent jurisdiction over Wade's state law claims. While the issue of whether the statute of limitations for Wade's state law claims was tolled while she engaged in the EEOC process has not been briefed, it would be inherently unfair to Wade to potentially deprive her of the opportunity to litigate her state law claims because of the statute of limitations when federal law required her to file an EEOC complaint prior to bringing her federal lawsuit. Moreover, the parties have already engaged in the expensive process of discovery and Wade's state law claims arise from the same common nucleus of operative fact which gave rise to her federal claims. This Court is the appropriate forum to litigate these state law claims under these circumstances and thus shall exercise its pendent jurisdiction to address the emotional distress state law claims.

four elements: "(1) extreme and outrageous conduct by the defendant; (2) that the defendant intended to cause severe emotional distress; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress must result." Stratmeyer v. Engberg, 649 N.W.2d 921, 926 (S.D. 2002) (quoting Christians v. Christians, 637 N.W.2d 377, 382 (S.D. 2001)). Plaintiffs attempting to demonstrate that a defendant's conduct was extreme and outrageous face a high threshold. See Harris v. Jefferson Partners, L.P., 653 N.W.2d 496, 500 (S.D. 2002) ("Proof under this tort must exceed a rigorous benchmark."). To be actionable, the defendant's conduct "must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.'" Fix v. First State Bank of Roscoe, 807 N.W.2d 612, 618 (S.D. 2011) (quoting Richardson v. E. River Elec. Power Co-op., Inc., 531 N.W.2d 23, 27 (S.D. 1995)). The conduct must be of a nature that is "calculated to cause," and which actually causes, extremely serious mental distress. Citibank (S.D.), N.A. v. Hauff, 668 N.W.2d 528, 535 (S.D. 2003) (quoting Richardson, 531 N.W.2d at 27). Whether a defendant's conduct is extreme and outrageous enough to permit recovery is initially a question for the court. Fix, 807 N.W.2d at 618; Richardson, 531 N.W.2d at 27-28. Only "[w]here reasonable men may differ, [is it] for the jury . . . to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." Richardson, 531 N.W.2d at 27 (quoting Restatement (Second) of Torts § 46 cmt. h (1965)).

To support her claim, Wade argues that Josko "clearly sabotaged" her career by telling her "not to worry about missing work" and then misrepresenting this conversation in the report Josko prepared and submitted to Human Resources about the incident. Doc. 24 at 21. While this issue has been exhaustively addressed above, this Court will note again that even if Josko did tell Wade

46

"not to worry" about missing the September 12, 2014 shift (as this Court must assume at this stage as Wade is the nonmoving party), Wade testified that she *did not* ask Josko whether missing the shift would result in any discipline and Wade did understand that it would be considered an unexcused absence. Doc. 16-1 at 21. Thus, even assuming that Josko presented "half-truths" in her report to SMC by deceptively omitting that she told Wade "not to worry" about missing her shift, this conduct fails as a matter of law to meet the "rigorous benchmark" required to prove extreme and outrageous conduct on the part of SMC. Harris, 653 N.W.2d at 500. That Josko made no specific representations to Wade that there would be no discipline for missing her shift *and* that Wade understood the incident would be considered an unexcused absence renders Josko's alleged conduct far short of that which is "utterly intolerable in a civilized community." Fix, 807 N.W.2d at 618.

Wade further argues that summary judgment on this claim is inappropriate because she has presented evidence of a hostile work environment fostered by Josko, because this abusive treatment was witnessed by others, including Dr. Waltz, and because Wade "was subject to intimidation, adverse personnel action, humiliation, and spite." Doc. 24 at 21. The allegations which Wade asserts to support a claim of a hostile work environment are addressed above and do not constitute the type of "extreme and outrageous conduct" necessary to support a claim of intentional infliction of emotional distress. Harris, 653 N.W.2d at 500. Dr. Waltz's statements about the hostile, intimidating, and abusive workplace that Josko fomented, and Wade's unsubstantiated claims that she was subjected to intimidation, adverse personnel action, humiliation, and spite do not constitute evidence which prevents summary judgment. The *actual* evidence in this case demonstrates at best a frustrating work environment for Wade.

Wade cites to the Supreme Court of South Dakota's decision in Petersen v. Sioux Valley Hospital Ass'n, 486 N.W.2d 516 (S.D. 1992), to argue that summary judgment is not appropriate under the circumstances presented here. In Petersen, the Supreme Court of South Dakota reversed the trial court's grant of summary judgment in favor of the defendant on an intentional infliction of emotional distress claim, finding that a triable issue of fact existed as to whether the employer had acted recklessly by holding a meeting with the plaintiff and other employees to discuss the plaintiff's work performance, but had ambushed the plaintiff by not informing her beforehand about the nature of the meeting. 486 N.W.2d at 519. However, in Petersen the supervisor who organized the meeting had "knowledge of [the plaintiff's] fear of confrontational group meetings" and thus the Supreme Court of South Dakota determined that reasonable minds could differ as to whether this constituted reckless conduct. Id. at 519–20.

Wade's claim is distinguishable from the Petersen case because there is no allegation that Wade had any condition that rendered her particularly vulnerable to emotional distress about which Josko had prior knowledge or that Josko engaged in conduct which triggered or exacerbated any such condition. Even if Josko had intentionally set Wade up to be terminated for missing her September 12, 2014 shift and even if Josko knew that Wade would be upset over losing her job, Wade's claim still fails because knowledge that someone will be upset over losing a job does not transform conduct which results in that outcome into an actionable claim for intentional infliction of emotional distress. See Reynolds v. Ethicon Endo-Surgery, Inc., 454 F.3d 868, 873–74 (8th Cir. 2006) (applying South Dakota law and stating that "[w]hile termination from a job may be upsetting, this does not in itself constitute extreme or outrageous conduct"). If Josko had knowledge that Wade suffered from some condition which would make her particularly vulnerable and likely to suffer from emotional distress, then perhaps Wade could establish the first element

48

of her claim. See Moysis v. DTG Datanet, 278 F.3d 819, 827–28 (8th Cir. 2002) (applying South Dakota law and upholding judgment for the plaintiff where the employer manufactured reasons for terminating the plaintiff even though the employer knew that the plaintiff's medical condition made him particularly vulnerable to emotional distress). That is not the case here. There is no genuine issue of material fact in dispute as to the first element of a claim for intentional infliction of emotional distress, and thus SMC is entitled to summary judgment on this claim.

### D. Negligent Infliction of Emotional Distress

To sustain a claim for negligent infliction of emotional distress, Wade must establish three elements: "(1) negligent conduct on the part of [SMC], (2) emotional distress suffered by [Wade], and (3) physical manifestations suffered by [Wade] from the distress." Reynolds, 454 F.3d at 874 (citing Nelson v. WEB Water Dev. Ass'n, 507 N.W.2d 691 (S.D. 1993)). "The three necessary elements of actionable negligence are: (1) [a] duty on the part of the defendant; (2) a failure to perform that duty; and (3) an injury to the plaintiff resulting from such a failure." Id. (quoting Blaha v. Stuard, 640 N.W.2d 85, 90 (S.D. 2002).

Wade argues that SMC "had a duty to refrain from abusive conduct toward" her and that SMC, through Josko's conduct, failed to perform this duty. Doc. 24 at 21. Wade cites to no statutory or case authority establishing the particular duty which she alleges SMC breached. As an employer, SMC owes a general duty of reasonable care to its employees to furnish a safe workplace. See Ecklund v. Barrick, 144 N.W.2d 605, 608 (S.D. 1966). However, the fact that Wade had unpleasant experiences with her supervisor does not amount to a breach of that duty on the part of SMC. Of course, the ADEA and Title VII impose a duty on SMC to refrain from subjecting Wade or any other employee to discrimination and discrimination-based harassment, but this Court has already determined that SMC did not violate these federal statutes. Moreover,

violations of South Dakota's analogue statute to Title VII—the South Dakota Human Rights Act (SDHRA)—are to be evaluated under the same standards used to evaluate Title VII claims. See Huck v. McCain Foods, 479 N.W.2d 167, 169–70 (S.D. 1991); see also Axness v. Aqreva LLC, 118 F. Supp. 3d 1144, 1157 (D.S.D. 2015) (noting that South Dakota courts examine claims under the SDHRA "under a standard identical to that applied to Title VII claims" and citing Huck). Besides, the SDHRA, which prohibits employers from discriminating on the basis of "race, color, creed, religion, sex, ancestry, disability, or national origin," does not list age as a protected class. SDCL § 20-13-10. Wade alleges that she was the victim of age-based discrimination and harassment, and thus cannot assert that SMC breached its duty under the SDHRA. Even if the SDHRA incorporated age as a protected class, any such assertion would fail for the same reasons Wade's federal claims fail.

Because Wade has pointed to no statutory or common law duty which SMC owed to her and failed to perform—other than her own assertion that SMC "had a duty to refrain from abusive conduct"— SMC is entitled to summary judgment on Wade's claim for negligent infliction of emotional distress.[14] See Harvey v. Reg'l Health Network, Inc., 906 N.W.2d 382, 397 (S.D. 2018) ("Because . . . [plaintiff] has not identified a legal duty imposed by statute or common law, the circuit court properly granted [defendant] summary judgment on [plaintiff's] claim of negligent infliction of emotional distress."). There is a substantial question whether on this record Wade had a physical manifestation of emotional distress, but this Court need not reach that issue because there was no breach of duty to justify a negligent infliction of emotional distress claim.

---

[14] Wade does not allege that SMC breached its duty by terminating her employment, and no duty of continued employment existed. See Reynolds, 454 F.3d at 874 ("In an employment-at-will state like South Dakota, the employer owes no duty of continued employment, and therefore may dismiss the employee at any time, for any reason, as long as an employment contract, a statute, or public policy does not indicate otherwise.").

### E. Punitive Damages

As SMC is entitled to summary judgment on all of Wade's claims and no cause of action remains, Wade's claim for punitive damages (Count V) is dismissed as well.

## IV. Conclusion

For the reasons stated above, it is hereby

ORDERED that SMC's motion for summary judgment, Doc. 14, is granted.

DATED this 10ᵗʰ day of August, 2018.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE